Bob HESS *v*. Mark TREECE

84-274 693 S.W.2d 792

Supreme Court of Arkansas
Opinion delivered July 15, 1985
[Rehearing denied September 9, 1985.*]

---

\* Purtle, J., not participating.

*Perroni & Rauls, P.A.*, by: *Samuel A. Perroni*, for appellant.

*Dodds, Kidd, Ryan & Moore*, by: *Judson C. Kidd*, for appellee.

GEORGIA ELROD, Special Chief Justice. This case involves the tort of outrage. Mark Treece, a Little Rock police officer, sued Bob Hess, a building contractor and Little Rock City Director, claiming that Hess had, over a period of some two years, engaged in intentional and outrageous conduct directed toward Treece, which resulted in the infliction of severe mental and emotional distress. The jury found for the appellee Treece and awarded $25,000 in compensatory and $50,000 in punitive damages.

Appellant raises fourteen points on appeal. Although several merit discussion, we find none constitutes error and accordingly affirm.

Appellee Mark Treece had been an employee of the Little Rock Police Department since 1973, and, during the period in question, was assigned to traffic services on the motorcycle squad. In late 1980 he met appellant Bob Hess when he dropped off Jayma Stephens, Hess' girlfriend, at Hess' house and some unfriendly words were exchanged between the parties. Around the time of this encounter Jayma Stephens began keeping company with Gary Wheat, Treece's best friend, who was also a police officer, and these relationships appear to have been the springboard for Hess' animosity toward Treece. Treece testified that in April 1981 he saw Hess following him. In Spring 1982 Treece informed by one of his superior officers, Capt. Timothy Daley, that Hess had called the Police Department to complain about Treece being at his apartment when he was supposed to be at work. During this conversation, according to Daley, Hess stated that he would have Treece's job at any cost, and that he was conducting surveillance of Treece and other officers. An internal police investigation of this complaint found Treece innocent of the charges.

In April 1982 Treece learned that Hess had lodged another complaint against him, this time for working an off-duty job at

Pulaski Academy when he should have been on duty. Treece had been given permission to work the Pulaski Academy job, but not while he was on duty for the Police Department. Treece again underwent an internal investigation and was suspended for three days, although it appears this was largely because he made false statements to the investigators. Treece also testified that he was called upon by his superiors frequently during the two years in question to account for his time, and that it was hard for him to do his job properly when he felt constantly scrutinized.

In April 1982 Treece talked to Mary Ann Haston, who was Hess' occasional bookkeeper. She told Treece that Hess had asked her to watch and report on Treece's movements.

A number of police officers testified during the trial. Captain Daley recounted the hour-long telephone conversation he had with Hess, stating that it was apparent to him that Hess had a grudge against Treece. In his personal investigations of Treece, Daley never found any wrongdoing. Lt. Albert Benafield stated that he was called upon frequently, "sometimes twice a week," to investigate Treece's conduct and that "it caused a lot of problems in my department." Lt. C. R. Watters stated that he investigated Treece on several occasions in connection with his Pulaski Academy job and never found any wrongdoing. E. J. Etheridge testified that he had been directed to conduct numerous investigations of Treece, sometimes on a daily or weekly basis. Jess Hale, Assistant Chief of Police in 1982, and Mahlon Martin, then City Manager, were both personally contacted by Hess concerning his complaints against Treece.

Mary Ann Haston, who lived in the same apartment complex as Treece, testified that Hess paid her to report on Treece's whereabouts; that he frequently called the Police Department from her apartment to complain about Treece, and that he stated that he would spend every dime he ever made to get Treece fired.

On the issue of damages, Treece testified that the frequency of the complaints and resultant investigations interfered with his ability to do his job; that he became concerned for the safety of his family and instituted security measures; and that he changed his lifestyle because of his fear. Several police officers commented that Treece appeared distraught, nervous and frightened during

this period of time and that he had asked for help.

Hess admitted that he had filed complaints against Treece but denied the alleged frequency. He denied having paid Mary Ann Haston to watch Treece and disputed Capt. Daley's recollection of the phone conversation. Hess admitted that he had contacted Gene Nail, an investigative reporter for the *Arkansas Democrat*, to look into the situation at Pulaski Academy and admitted he had "bad feelings" toward Treece.

Appellant contends that there was no substantial evidence to support the jury finding of intentional infliction of mental distress. On appeal we must view the evidence in the light most favorable to the appellee, Mark Treece. *B. J. McAdams, Inc.* v. *Bess Refrigeration, Inc.*, 265 Ark. 519, 579 S.W.2d 608 (1979).

This Court first defined the tort of extreme outrage in *M.B.M. Co.* v. *Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980):

. . . [O]ne who by extreme and outrageous conduct willfully or wantonly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress.

The emotional distress for which damages may be sought must be so severe that no reasonable person could be expected to endure it.

By extreme and outrageous conduct, we mean conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society. See Restatement of the Law, Torts 2d 72, §46, Comment d.

In *M.B.M. Co.* v. *Counce*, supra, an employee who was suspected of stealing was told she was being laid off because there were too many employees. She was later required to take a polygraph test and, although she passed, her last paycheck reflected a deduction for the missing money. Her employer then caused her to be denied unemployment benefits. We held that the trial court's granting of a summary judgment in favor of the employer was error and that a fact question was made.

We next examined the tort of outrage in *Givens* v. *Hixson*, 275 Ark. 370, 631 S.W.2d 263 (1982), again on appeal of a summary judgment in favor of the employer, and here found that the conduct complained of did not rise to the level of outrageous. In *Tandy Corp.* v. *Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984), also involving alleged outrageous conduct in the employer/employee context, we found that there was substantial evidence to support a finding of outrage, but we reversed on other grounds. In this case, the employee was subjected to an intense and lengthy interrogation on his handling of the store's operations. His employer refused to permit him to take his medication during the interrogation, even though he knew of the employee's lack of emotional stamina and the fact that he was on regular medication for this problem.

We also found outrageous conduct in *Growth Properties I* v. *Cannon*, 282 Ark. 472, 669 S.W.2d 447 (1984). The owner of a cemetery, in constructing a new crypt, moved heavy equipment across the graves of plaintiff's relatives which caused exposure of their vaults. The damage could have been avoided by the use of an alternate access route, and we found that these acts of careless and callous disregard fit within the definition of outrage.

Although we have emphasized that the recognition of this tort is not intended to "open the doors of the courts to every slight insult or indignity one must endure in life," *Tandy Corp.* v. *Bone*, supra, we find that the facts in the case before us meet the requirements we have set down.

The fact situations in the cases cited above all involved either acts or conduct of limited duration in time. Bob Hess' actions directed against Mark Treece continued over a period of two years or more. He made not one complaint, but many; he not only followed Treece himself but had others follow him; he communicated his threats to "get Treece fired" via more than one source. Except for the one incident when Treece was suspended for three days, primarily for giving a false statement to the investigators and not for working another job while on duty, no misconduct was found. Nor can we agree with Hess' contention that his actions were not the proximate cause of any emotional distress suffered by Treece. There was ample evidence to show that Hess was the moving force behind the repeated police

investigations of Treece, and the fact that there was little face-to-face contact between the two men does not prevent a finding of proximate cause.

 Hess argues that as a private citizen he was privileged to complain to authorities about the conduct of public officials, and that as a member of the Board of Directors he was entitled to a qualified immunity for discretionary functions. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727 (1982). The claim of immunity is, however, subject to the requirement of good faith, and the question of good faith is one for the jury. *McMillion v. Armstrong*, 238 Ark. 115, 119, 378 S.W.2d 670, 673 (1964). In fact, the jury could have found that Hess' conduct became even more outrageous after he took office as City Director in January of 1983, thus acquiring a position of greater influence, if not actual authority, over city employees. The fact that Mark Treece happened to be a city employee should not deprive him of protection from outrageous conduct; nor should the fact that Bob Hess happened to be a City Director relieve him of responsibility for his actions.

We therefore find substantial evidence to support the verdict of outrageous conduct and also to support the award of damages, both compensatory and punitive.

 Appellant's next argument for reversal is that the trial court failed to instruct the jury properly on the issue of punitive damages. The court gave AMI 2217, and we have held that this instruction is not proper in a case of intentional tort. *Ford Motor Credit Co. v. Herring*, 267 Ark. 201, 589 S.W.2d 584 (1979); *Tandy Corp. v. Bone, supra.*

Before appellant can raise this issue on appeal, however, he must have made a proper, specific objection to the instruction in the trial court. A.R.C.P. Rule 51. Appellant's objection to the instruction was:

> I have the same objection on that instruction, Your Honor. I don't believe that the evidence supports giving that instruction. I think the plaintiff's counsel is confusing motive with malice, and a person's motive for making a complaint is irrelevant and I don't think supports a punitive damage instruction. So I feel that the evidence is

insufficient.

Appellant did not submit a proposed instruction on punitive damages, and his objection was general, not specific. An objection which merely complains that a jury instruction is an incorrect declaration of the law is a general objection, reserving no point for review. *AAA TV & Stereo Rentals, Inc.* v. *Crawley*, 284 Ark. 83, 679 S.W.2d 190 (1984); *CBM of Central Arkansas* v. *Bemel*, 274 Ark. 223, 623 S.W.2d 518 (1981); *Chandler* v. *Kirkpatrick*, 270 Ark. 74, 603 S.W.2d 406 (1980).

■ Appellant contends that the trial court erred in admitting certain police reports into evidence. The trial court admitted under the "business records" exception to the hearsay rule, Unif. R. Evid. 803(6): (1) a report made by Lt. Tim Daley to his superior concerning the telephone conversation he had with Hess in March, 1982; (2) Lt. Benafield's memo to Lt. Daley responding to a request for investigation on Treece's schedule; and (3) Sgt. Watters' memo to Lt. Benafield objecting to the frequency of complaints by Hess. Appellant argues that the reports were inadmissible under Unif. R. Evid. 803(8)(i),(iv) and (v), which prohibit the introduction of investigative reports by police and other law enforcement personnel, factual findings resulting from special investigation of a particular complaint, case or incident, or any matter as to which the source of information or other circumstances indicate lack of trustworthiness. Although these reports may not technically have come within the business records exception, the trial court has substantial latitude under Rule 803(24) to admit evidence which it feels meets the spirit of the rule. In each instance the report was submitted through its author, who was subject to cross examination on its contents. In addition, many of the statements in the Daley memorandum to which appellant objected were admissions, e.g. "He [Hess] further stated that he hates the sight of all police officers. . . .", and were thus not hearsay under Rule 801(d)(2). We, therefore, cannot say that the trial court erred in admitting this evidence.

■ Appellant further contends that the trial court erred in admitting certain evidence contrary to the directives of a pretrial order. On April 24, 1984, Judge David Bogard entered a pretrial order which provided that: (1) information from plaintiff's tax returns was not to be introduced into evidence at the trial until the

court decided preliminarily that a submissible issue of punitive damages had been established, and that (2) the contents of a police investigative file, or the nature of the investigation would not be referred to or offered at trial until relevance had been established to the court's satisfaction. The police investigative file related to the theft and burning of an automobile in which Bob Hess had an interest. A.R.C.P. Rule 16 provides:

> The court shall make an order which recites the action taken at the conference, . . . and the agreements made by the parties as to any of the matters considered . . . ; and such order, when entered, controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice.

Although the pretrial order was entered by Judge Bogard, the case was tried before Special Circuit Judge Gordon Rather. At trial when appellee's counsel broached the subject of the income tax returns, appellant's counsel objected and a conference was held in chambers, the court ruling that sufficient evidence had been produced to submit the question of punitive damages to the jury; hence, the income tax returns were admissible. With regard to the police investigative file, no such file was ever introduced, and the court specifically limited questioning on the issue of the stolen and burned car. Although some confusion might have been eliminated had the same judge handled the case from beginning to end, we cannot say that there was any abuse of discretion by the trial judge in admitting this evidence.

 Appellant's next point involves the trial court's admission of Mary Ann Haston's testimony concerning a telephone conversation she had with appellant. She said appellant said that Bob Troutt, a man who was convicted of beating a radio disc jockey in a well-publicized trial, had pulled up on his motorcycle and that he (appellant) was going to have "Treece taken care of" and "a car set on fire and burned." Appellant argues this is inadmissible character evidence under Unif. R. Evid. 404, and that it is irrelevant under Rule 403. Rule 404(b) permits the introduction of character evidence to show motive or intent, and Rules 401 and 402 define and permit the introduction of relevant evidence. The trial court's determination of relevance will not be reversed unless this court finds an abuse of discretion.

*Hamblin* v. *State*, 268 Ark. 497, 597 S.W.2d 589 (1980). *Arkansas Power & Light Co.* v. *Johnson*, 260 Ark. 237, 538 S.W.2d 541 (1976). We find no abuse of discretion.

 Appellant next argues the trial court erred in limiting appellant's cross-examination of the witness Mary Ann Haston concerning felony false pretense convictions which were entered more than ten years prior. At trial appellant asked the witness whether she had ever been convicted of anything, and she responded "no." He then sought to introduce certified copies of Pulaski County Circuit Court records showing she had been convicted on two counts of felony false pretenses in 1965. He contends that the records were offered not to impeach her character but to contradict her testimony. Unif. R. Evid. 609 provides that evidence of a prior conviction is not admissible if a period of ten years has passed since the date of the conviction or the release of the witness from the confinement imposed for that conviction, whichever is the later date. Rule 609 makes no distinction between impeachment of character and contradiction of testimony, and we therefore conclude the trial court was correct in excluding this evidence.

 Appellant cites as error the trial court's refusal to give his requested instruction on the burden of proof. He contends that a higher burden of proof is required in cases involving the tort of outrage, and offered this instruction:

> The party having the burden of proof on a proposition must establish it by clear evidence or proof. "Clear evidence" means evidence which is positive, precise and explicit and which tends directly to establish the proposition. That is, whether the proposition has been proved by a high probability.

> "Clear evidence" is not necessarily established by the greater number of witnesses testifying to any fact or state of facts.

Appellant cites *Givens* v. *Hixson*, 275 Ark. 370, 631 S.W.2d 263 (1982) in support of his requested instruction. The trial court refused the instruction and gave instead AMI 202, stating that a preponderance of the evidence is the appropriate standard. Although in *Givens* v. *Hixson*, supra, we emphasized the need for

"clear-cut proof," we did not raise the level of proof required beyond a preponderance of the evidence, which has consistently been the required standard in civil cases. *McWilliams, et al.* v. *Neill*, 202 Ark. 1087, 155 S.W.2d 344 (1941).

■ Appellant contends that the trial court erred in failing to grant appellant's motion for summary judgment on the grounds that appellee failed to attach affidavits or depositions to his response to the motion sufficient to show the existence of a genuine issue of material fact. The exhibits attached to appellant's motion itself, however, were more than sufficient to show a factual dispute between the parties, and summary judgment would not have been an appropriate disposition of the case. See A.R.C.P. Rule 56(c).

■ Appellant's next two points involve a witness who never testified, Lavonia Gray, a man who at the time of trial was serving time at Cummins Prison and who was subpoenaed to the courthouse as a possible witness by plaintiff's counsel while the trial was in progress. Although the trial court refused to permit Gray's testimony and he was therefore never before the jury, his presence in the courthouse attracted attention from the news media covering the trial and a television newscast described Gray, a convicted arsonist of some notoriety, as a possible witness. Appellant's motion to the court to poll the jurors to see whether any had seen the news broadcast was denied, and he cites this refusal as error. The record shows that the trial judge repeatedly admonished the jurors not to discuss the trial, read newspaper articles about it, or watch television reports. Appellant submitted no evidence that any of the jurors had seen the broadcast, seen Lavonia Gray in the courthouse, or been improperly influenced in any way. The party raising the issue of improper influence must show that it exists. *Hutcherson* v. *State*, 262 Ark. 535, 558 S.W.2d 156 (1977). At the courthouse, while the trial was in recess, Lavonia Gray gave a sworn statement to appellee's counsel that he had been contacted by Bob Troutt to "get rid of a car" for him. Appellee then sought to call Gray as a rebuttal witness, but the trial court refused. Subsequent to the conclusion of the trial, Gray recanted his earlier statement, and appellant argues that this admission of perjury by Gray constitutes sufficient newly discovered evidence to warrant a new trial. The trial court denied the motion for a new trial, for the reason that Gray's

testimony was never received into evidence, and his later contradiction, therefore, could have had no effect on the outcome of the trial. We agree.

Appellant also contends that the conduct of appellee's counsel during the trial was so prejudicial to the rights of appellant that he was denied a fair and impartial trial and that a new trial should be ordered. As the record reflects, both parties were zealously and energetically represented by their respective attorneys. The trial was a lengthy, emotional process for all concerned. We find nothing, however, to show that appellee's counsel overstepped permissible bounds to the point of unfair prejudice to appellant and uphold the finding of the trial court that grounds for a new trial were not shown.

Affirmed.

GEORGE ROSE SMITH and PURTLE, JJ., dissent.

HOLT, C.J., not participating.

JOHN I. PURTLE, Justice, dissenting. In my opinion the only outrage to be found in this case is the majority opinion. The present case seems to attempt to embrace the torts of bad faith, interference with a contract, intentional infliction of emotional distress (outrage), negligence, slander, and perhaps libel.

The tort of bad faith had its genesis in automobile liability cases where insurers acted in bad faith in not settling personal injury claims. Although the "bad faith" doctrine may have started in California, we recognized it in *Tri-State Insurance Co. v. Busby*, 251 Ark. 568, 473 S.W.2d 893 (1971). In *Busby* we held that an insurance company was liable in excess of its policy limits if it had failed, due to "fraud, bad faith, or negligence," to settle within the policy limits. To the same effect see *Members Mutual Insurance Co. v. Blissett*, 254 Ark. 211, 492 S.W.2d 429 (1973). The tort of bad faith in refusing to settle with an insured pursuant to the terms of a fire insurance policy was approved in the case of *Aetna Casualty & Surety v. Broadway Arms*, 281 Ark. 128, 664 S.W.2d 463 (1983).

So far as I can determine, the tort of intentional infliction of emotional distress was first recognized in Arkansas in the case of *M.B.M. Co. v. Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980). In

*M.B.M.* we stated: "[W]e . . . do now recognize that one who by extreme and outrageous conduct wilfully or wantonly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. . . . By extreme and outrageous conduct, we mean conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." There was no award of damages in *M.B.M.* because the case came to us on appeal from a summary judgment dismissing the cause of action. We reversed and remanded. We did approve an award of actual and punitive damages for the tort of outrage in *Growth Properties I* v. *Cannon*, 282 Ark. 472, 669 S.W.2d 447 (1984). The outrageous act in *Cannon* was the defendants' use of part of a burial plot as a road during construction, thereby exposing and driving upon the vaults of plaintiffs' deceased relatives. Repeated traffic across the burial plot was indeed something beyond the bounds of decency. However, in the earlier case of *Givens* v. *Hixson*, 275 Ark. 370, 631 S.W.2d 263 (1982) we upheld a summary judgment against the plaintiff who had alleged in his complaint that he had been the victim of an intentional infliction of emotional distress by having his employment terminated publicly, abruptly, and without good reason. In *Givens* we again stated the tort of outrage could be established where the conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

If we take every allegation of the complaint as fully proven at the trial, there still are no grounds to support an award for the tort of bad faith or of outrage. Nothing alleged or proved comes anywhere close to conduct which could be described as outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. The only actions taken by the appellant were in following appellee, having him followed or watched, and reporting that the appellee was working for a private corporation during the time he was supposed to be on duty for the police department. There was also testimony that appellant tried to have appellee discharged from the police depart-

ment. The only disciplinary action taken against the appellee was the result of appellee's failure to tell the truth about one of the matters which was investigated as a result of appellant's complaint. There was no proof that any of appellant's complaints about appellee was untrue.

It is not outrageous as far as I am concerned for one person to try to keep up with what another person is doing. If a policeman or other investigator had done the same things appellant did, no one would have had a second thought about it. Apparently a jealous spouse or sweetheart cannot check up on the other without it becoming an outrage. Lawyers may be handicapped in investigating certain claims as a result of the majority opinion. Appellant may well be guilty of interfering with a contract of employment or slander but he is not guilty of outrage as we have previously defined the tort. Appellant may be guilty of invading the privacy of the appellee or several other recognized torts but his actions were not, in my opinion, utterly intolerable in a civilized society. The mischief done by the majority opinion far outweighs the good it will do.

Citizens may now be afraid to complain of conduct on the part of public officials or employees. Apparently they will now be obliged to keep their mouths shut about what they perceive as misconduct on the part of public employees or officials or face being sued for outrageous conduct.

We considered the tort of outrage in *Tandy Corp.* v. *Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984) where this same instruction (AMI 2217) was given. We reversed because the instruction should not have been given. I believe the objection by appellant's counsel was proper and specific. Apparently he failed to utter magic words of some sort. If giving the instruction was reversible error in *Tandy* it should be reversible error here.

Reports of the police department investigations should not have been allowed. The introduction of these reports flies in the face of Unif. R. Evid. 803 (8) (i), (iv), and (v). I am not suggesting that these investigative reports were fabrications but they did result from special investigations by the police department and clearly came within the prohibitions of Unif. R. Evid. 803.

It is interesting to note in the report of Captain Daley that he

characterized appellant as reflecting "a personality disorder of paranoid schizophrenia. This man demonstrated marked persecutory trends. . . ." Later he testified that he had only spoken with appellant once. Captain Daley also stated: "In all fairness to Mr. Hess and the parties involved, you could understand how he could be upset and distraught over a situation if he felt he was making complaints and the complaints were not being addressed." This witness for the appellee did not view appellant's conduct as outrageous although he classified appellant as being paranoid and as having hallucinations. There is no basis for Captain Daley making these diagnoses. Even if this report was not prohibited by the rules its unfair prejudice far outweighed any probative value it might have had. Not a single witness nor collection of witnesses described conduct which is repugnant to a civilized society.

Appellee's testimony was that the frequent investigations caused him concern about his job. He stated appellant followed him in April, 1981, and that about a year later appellant informed appellee's supervisor that appellee was at an apartment when he was supposed to be at work. In April, 1982, appellant reported appellee was working at a private job during his normal duty hours. The ensuing investigation at least proved appellant's complaint was not unfounded. About the only other act complained of was that appellant paid others to report on appellee's conduct. Appellee's expressed fears for the safety of his family seem completely unfounded. There were never even any allegations of violence or threats to the appellee's family. There is nothing to prove that appellant even caused all the investigations to be initiated.

Even though there clearly was no proof of the tort of outrage I would send the case back for a new trial. There were allegations in the complaint which would support an award of damages on other grounds.