CALVARY CHRISTIAN SCHOOL, INC., Terry Neeley,
Michael Borden, M.C. Lewellen, Jr., David Rogers, Individually
and In Their Capacities as Directors of Calvary Christian School and
Suzanne Hess *v.* Ted HUFFSTUTTLER, Dorma Huffstuttler,
and Preston Huffstuttler

05-343                                          238 S.W.3d 58
Supreme Court of Arkansas
Opinion delivered June 29, 2006

[Rehearing denied September 7, 2006.*]

---

\* GLAZE and DICKEY, JJ., would grant rehearing.

*Christopher W. Morledge, P.A.*, and *Sharpe, Reynolds & Tillman*, by: *J. Shelby Sharpe*, for appellants.

*Tony Wilcox, P.A.*, and *Richard L. Proctor*, for appellees.

ANNABELLE CLINTON IMBER, Justice. This case concerns the disenrollment of Appellee Preston Huffstuttler (Preston) by Appellant Calvary Christian School, Inc. (Calvary Christian). A jury awarded Preston damages for breach of contract, intentional interference with a contract, outrage, and defamation. The jury also awarded Preston's mother, Appellee Dorma Huffstuttler, damages for defamation. On appeal, Appellants Calvary Christian, Terral Neeley, Michael Borden, M.C. Lewellen, Jr., and David Rodgers, individually and in their capacity as directors of Calvary Christian, and Suzanne Hess, raise ten points for reversal. Those ten points can be grouped into three categories: (1) the circuit court did not have subject-matter jurisdiction of this case, (2) in the event the circuit court did have jurisdiction, the court erred in denying their directed-verdict motions on all the alleged claims, and (3) if the directed-verdict motions were correctly denied, the award of damages should be reversed. We affirm in part and reverse and dismiss in part.

Calvary Christian is a parochial school located in Forrest City. It is undisputed that Preston, a junior in high school, had attended Calvary Christian since kindergarten. During Preston's junior year, in September 2001, Preston discovered a video camera hidden in the duct work (the ventilation system) of his school classroom at Calvary Christian. He reported the video camera's presence to his teacher, Rhea Hall, and to his parents, Appellees Ted and Dorma Huffstuttler. Because the classroom was also used as a dressing room for school events, the Huffstuttlers became concerned and complained about the camera to school authorities at a school meeting attended by other parents. Suzanne Hess, one

of the school's principals, initially denied the presence of the camera, but later admitted it was placed there by a school board member, M.C. "Buddy" Lewellen. Thereafter, a dispute concerning the school's loss of accreditation and the use of a hidden video camera developed between Calvary Christian and Ted and Dorma Huffstuttler. On January 10, 2002, the Huffstuttlers were asked to sign a new agreement,[1] whereby their family would agree to support the policies, procedures, staff, and administration of the school. The Huffstuttlers all signed that agreement. On January 17, however, the governing board of Calvary Christian decided to disenroll Preston. Immediately following Preston's disenrollment, the Huffstuttlers filed a complaint, seeking to keep their son enrolled in the school. Although the Huffstuttlers nonsuited their complaint on March 28, 2002, they reinstituted the suit by filing another complaint on September 26, 2003. In that complaint, the Huffstuttlers sought damages for breach of contract, intentional interference with contractual relationships, outrage, and defamation. In addition to compensatory damages, the Huffstuttlers requested punitive damages. Appellants filed a motion to dismiss and, alternatively, for summary judgment. In essence, Appellants challenged the circuit court's subject-matter jurisdiction because the case involved a parochial school. The circuit court denied the motion, and Appellants then filed a petition for a writ of prohibition with this court, which petition was denied on May 13, 2004.

The suit proceeded to trial, and the jury found in favor of the Huffstuttlers. They awarded (1) the Huffstuttlers $10,000 for breach of contract, (2) Preston $25,000 in compensatory damages and $75,000 in punitive damages for the tort of outrage, (3) Preston $25,000 in compensatory damages and $25,000 in punitive damages for intentional interference with the contract between the Huffstuttlers and Calvary Christian, (4) Preston $10,000 in compensatory damages and $15,000 for punitive damages for defamation, and (5) Dorma zero compensatory damages and $5,000 for punitive damages for defamation. Following the circuit court's entry of judgment on October 18, 2004, Appellants filed a motion for judgment notwithstanding the verdict (JNOV), and alternatively for new trial, on October 26, 2004. Pursuant to Ark.

---

[1] The record reveals that, for every new academic school year, the Huffstuttlers completed a reenrollment form, in which they agreed to comply with the school's policies.

R. App. P.–Civil 4(b) (2006), the posttrial motion was deemed denied on November 25, 2004. Appellant timely filed a notice of appeal on December 1, 2004.

The case has been certified to this court by the Arkansas Court of Appeals as a case involving an issue of first impression, federal constitutional interpretation, substantial public interest, and one needing clarification and development of the law. Our jurisdiction is therefore proper pursuant to Ark. Sup. Ct. R. 1-2(b)(1), (3), (4), & (5) (2006).

In the first and second points on appeal, Appellants contend that the circuit court erred in denying the motion to dismiss because all of the claims arising out of Preston's disenrollment are outside the circuit court's subject-matter jurisdiction. In its order, the circuit court concluded that there was insufficient information to conclude that Calvary Christian, as a matter of law, was a "religious institution entitled to the protections and immunities of the First and Fourteenth Amendment." The circuit court further ruled that "exceptions to absolute immunity exist. These exceptions include instances wherein the Court may resolve the dispute through the application of neutral principles of law and where the conduct at issue affects the public morals, welfare and safety."

Our court reviews a trial court's decision on a motion to dismiss by treating the facts alleged in the complaint as true and by viewing them in the light most favorable to the plaintiff. *Clowers v. Lassiter*, 363 Ark. 241, 213 S.W.3d 6 (2005). In viewing the facts in the light most favorable to the plaintiff, the facts should be liberally construed in the plaintiff's favor. *Id.* Our rules require fact pleading, and a complaint must state facts, not mere conclusions, in order to entitle the pleader to relief. *Id.*; Ark. R. Civ. P. 8(a)(1) (2006).

To support the position that the circuit court was without jurisdiction to rule on the claims arising out of Preston's disenrollment, Appellants contend that religious, educational institutions have a constitutionally protected right to be free from civil court interference. Their argument is rooted in the U.S. Supreme Court's decision *Watson v. Jones*, 80 U.S. 679 (1871). In *Watson*, the Court first considered the issue of judicial involvement in a hierarchical[2] church's property dispute. Specifically, the Court was asked to determine which sect of the church had control over

church property. As a result of the Court's holding that the civil courts were not allowed to interfere in the property dispute, this case became the landmark case for the principle that the judiciary cannot inquire into church matters — it is simply without jurisdiction to do so. The Court held, in part:

> All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

*Id.* at 729. Since *Watson*, the Supreme Court has dealt with a gamut of cases concerning the issue of when civil courts have jurisdiction to determine church disputes. *Bouldin v. Alexander*, 82 U.S. 131 (1872); *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1 (1929); *Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox Church in North Am.*, 344 U.S. 94 (1952); *Presbyterian Church v. Mary Elizabeth Blue Hull Mem. Church*, 393 U.S. 440 (1969); *Serbian Eastern Orthodox for the United States of Am. & Canada v. Milivojevich*, 426 U.S. 696 (1976); and *Jones v. Wolf*, 443 U.S. 595 (1979). Yet, all but one of these cases, *Serbian Eastern Orthodox for the United States of America & Canada v. Milivojevich, supra*, dealt with church property disputes.[3] In sum, the steadfast rule announced by the Court was that unless

---

[2] In *Guinn v. Church of Christ of Collinsville*, 775 P.2d 766, 773 n.18 (Okla. 1989), the Oklahoma Supreme Court noted that the Supreme Court had addressed civil-court inquiry into ecclesiastical decisions made by hierarchical churches, but that the Court had not yet addressed the issue in the context of a self-governing church which is congregational in form. The Oklahoma Supreme Court concluded that a religious organization's ecclesiastical decisions should be protected from judicial scrutiny whether the organization is "congregational" or "hierarchical." We agree that ecclesiastical or doctrinal decisions made by self-governing religious organizations are no less deserving of judicial deference than decisions made by religious organizations structured in a hierarchical fashion.

[3] Appellants also rely upon the Supreme Court's decisions in *Everson v. Bd. of Ewing Township*, 330 U.S. 1 (1947) and *Cantwell v. Connecticut*, 310 U.S. 296 (1940), but those cases are inapposite. In *Everson*, the appellee, a township board of education, authorized reimbursement to parents, in accordance with a statute, for money expended by them for their children's

"neutral principles of law" apply, judicial scrutiny of ecclesiastical doctrine is banned under the First Amendment. This settled rule of law, however, has since been diluted with the Court recognizing the possibility of civil court review. In *Gonzalez v. Roman Catholic Archbishop of Manila, supra,* the Court stated:

> In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise.

*Id.* at 16-17. Thereafter, however, the Court retracted its "fraud, collusion, or arbitrariness" exception, noting that is was only dictum. In *Serbian Eastern Orthodox for the United States of America & Canada v. Milivojevich, supra,* the Court noted:

> Whether or not there is room for "marginal civil court review" under the narrow rubrics of "fraud" or "collusion" when church tribunals act in bad faith for secular purposes, no "arbitrariness" exception — in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations — is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of a hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law.

*Id.* at 713. As a result, the Court has eliminated the "arbitrariness" exception to the rule that civil courts are prohibited from adjudicating religious disputes. The Court, however, has not revisited the issue of whether civil courts can review ecclesiastical decisions for "fraud" or "collusion."

---

bus transportation. A taxpayer filed suit, challenging the right of the board to reimburse parents of parochial school students. The Court affirmed the New Jersey Supreme Court's holding, finding that the statute did not conflict with either the state or federal constitution. In *Cantwell,* the appellant was criminally prosecuted under a breach-of-the-peace statute when he played a phonograph record entitled "Enemies," an attack on the Catholic religion, within the hearing of two Roman Catholic men. The Court overturned Cantwell's conviction as violative of the First Amendment, concluding that the intangible harm caused by Cantwell's religious beliefs were insufficient to justify civil or criminal liability. While both of these cases do support the proposition that the government cannot restrain religious freedom, neither case involved a religious institution.

■ In light of these holdings set forth in *Watson* and its progeny, a number of related issues have been raised and developed in the federal circuits and in state courts. For instance, the federal courts have addressed the issue of whether the "neutral principle" doctrine applies to Title VII claims. *McDowell v. Calvin Presbyterian Church*, 397 F.3d 790 (9th Cir. 2005); *Bryce v. Episcopal Church in the Diocese of Colorado*, 121 F.Supp. 2d 1327 (2000); and *Smith v. The Raleigh District of the North Carolina Conference of the United Methodist Church*, 63 F.Supp. 2d 692 (E.D.N.C. 1999). Likewise, state courts, and federal courts in diversity cases, have been asked to decide whether the "neutral principle" doctrine applies to state breach-of-contract and tort claims. *El-Farra v. Sayyed*, 365 Ark. 209, 226 S.W.3d 792 (2006); *Guinn v. Church of Christ of Collinsville, supra*; *Williams v. Gleason*, 26 S.W.3d 54 (Tex. Ct. App. 2000); *Drevlow v. Lutheran Church*, 991 F.2d 468 (8th Cir. 1993); *Belin v. West*, 315 Ark. 61, 864 S.W.2d 838 (1993); and *Paul v. Watchtower Bible & Tract Soc'y of New York, Inc.*, 819 F.2d 875 (9th Cir. 1987). *See also Gipson v. Brown*, 288 Ark. 422, 706 S.W.2d 369 (1986).[4] With so many federal and state courts weighing in on the issue, it is no surprise that a split of authority has developed. With respect to state breach-of-contract and tort claims, some courts have ruled that where an ecclesiastical issue underlies some of the claims, such as a breach-of-contract claim, all of the claims should be dismissed, thereby precluding the civil court from exercising jurisdiction over any of the claims. For instance, in *Gaston v. Diocese of Allentown*, 712 A.2d 757 (Pa. 1998), the appellants, students at a catholic school, were expelled. The Diocese of Allentown Department of Education ratified the expulsion. Appellants sued the Diocese of Allentown and the principal in tort for negligence and intentional infliction of emotional distress. The trial court dismissed the complaint on jurisdictional grounds, "stating that the action was an attempt to involve civil courts in ecclesiastical rule, custom or law, as upheld and affirmed by a bishop of the Roman Catholic Church." *Id.* at 758. The Pennsylvania Supreme Court affirmed, and dismissed the entire case for

---

[4] 'Appellants' reliance on the Arkansas Court of Appeals' decision in *Key v. Coryell*, 86 Ark. App. 334, 185 S.W.3d 98 (2004), is misplaced. In that case, the mother of a student formerly enrolled at parochial school brought suit in tort and for breach of contract. The court of appeals affirmed dismissal of the complaint *on the merits*, not for lack of subject-matter jurisdiction.

lack of jurisdiction. On the other hand, the Eighth Circuit Court of Appeals in *Drevlow v. Lutheran Church, supra,* dismissed only the claims that directly related to ecclesiastical issues and permitted the remaining claims to proceed to trial.[5] *Id.* In *Drevlow, supra,* Drevlow was an ordained minister within the Synod. As one of its services to church members, the Synod prepared and circulated personal information files on its ministers to churches interested in hiring pastors. The Synod placed a document in Drevlow's file stating that his spouse had been previously married, which statement was untrue. As a result, Drevlow alleged that he was injured because churches within the Synod automatically disqualify ministers if their file reflects that their spouse has been divorced. Drevlow filed a suit against the Synod for libel, negligence, and intentional interference with his legitimate expectancy of employment. The district court granted summary judgment, finding that all the claims involved matters that should be strictly between the clergy and the church. Thus, all of the claims were dismissed for a lack of subject-matter jurisdiction. In reversing the district court's decision, the Eighth Circuit Court of Appeals concluded in part:

> The First Amendment proscribes intervention by secular courts into many employment decisions made by religious organizations based on religious doctrine or beliefs. Personnel decisions are protected from civil court interference where review by civil courts would require the courts to interpret and apply religious doctrine or ecclesiastical law. *See Milivojevich,* 426 U.S. at 717-20, 96 S.Ct. at 2384 (review of church decision to defrock Bishop impermissible where resolution required interpretation of internal church procedures); *Scharon,* 929 F.2d at 363 (resolution of Title VII and ADEA claims required impermissible inquiry into the good faith of position asserted by clergy-administrators); *Kaufmann v. Sheehan,* 707 F.2d 355, 358 (8th Cir.1983) (priest's claim that church officials

---

[5] The Virginia Supreme Court and other federal courts have recognized the "ministerial exception" to the "neutral principles" doctrine in cases where aggrieved ministers have filed suit against religious institutions. *Jae-Woo Cha v. Korean Presbyterian Church of Washington,* 262 Va. 64 (2001); *Rayburn v. General Conference of Seventh-Day Adventists,* 722 F.2d 1164, 1167-98 (4th Cir. 1985), *cert. denied,* 478 U.S. 1020 (1986); *Werft v. Dester Sw. Annual Conference,* 377 F.3d 1099, 1100 n.1 (9th Cir. 2004); *Bollard v. Calif. Prov. of the Soc'y of Jesus,* 196 F.3d 940, 950 (9th Cir. 1999); *Lewis v. Seventh Day Adventist Lake Region Conference,* 978 F.2d 940, 942 (6th Cir. 1992), and *Natal v. Christian & Missionary Alliance,* 878 F.2d 1575, 1577 (1st Cir. 1989).

denied him ecclesiastical due process and violated his canonical rights goes to the heart of internal church faith and discipline); *Knuth v. The Lutheran Church Missouri Synod*, 643 F.Supp. 444 (D. Kan. 1986) (court lacks subject matter jurisdiction to review removal of minister from clergy roster). The First Amendment does not shield employment decisions made by religious organizations from civil court review, however, where the employment decisions do not implicate religious beliefs, procedures, or law. *See Scharon*, 929 F.2d at 363 n.3 (and cases cited therein).

At the present stage of this litigation we are unable to predict that the evidence offered at trial will definitely involve the district court in an impermissible inquiry into the Synod's bylaws or religious beliefs. Drevlow has alleged that although over three hundred congregations were in need of a pastor he did not receive an offer of employment from any congregation while the Synod was circulating false information about his spouse. Drevlow's fitness as a minister is not in dispute because his name was on the Synod's roster of eligible ministers during the relevant period. Correspondence between the Synod President and Drevlow indicates that after the false information was removed from his file, Drevlow did receive an offer and is now a pastor. Drevlow claims that he was injured by the Synod's alleged libel, negligence, or intentional interference with his legitimate expectation of employment. The Synod has not offered any religious explanation for its actions which might entangle the court in a religious controversy in violation of the First Amendment. [Footnote omitted.] Drevlow is entitled to an opportunity to prove his secular allegations at trial.

On remand, the district court must exercise care to ensure that the evidence presented at trial is of a secular nature. The court has expressed concern that it may become entangled in inherently religious determinations of Drevlow's fitness for the ministry if Drevlow attempts to offer evidence at trial of other efforts by the Synod to impugn his fitness for pastoral office. It is incumbent upon the court to limit the evidence at trial in order to avoid determining religious controversies. If further proceedings reveal that this matter cannot be resolved without interpreting religious procedures or beliefs, the district court should reconsider the Synod's motion to dismiss.

*Drevlow v. Lutheran Church*, 991 F.2d at 471-72 (internal citations omitted). We are persuaded by the Eighth Circuit's analysis in

*Drevlow, supra.* Accordingly, only those claims in the instant case which relate directly to religious doctrine or beliefs will be protected from civil court interference.

■ The Huffstuttlers filed claims for breach of contract, intentional interference with a contract, outrage, and defamation.[6] After a review of each individual claim, we conclude that the circuit court lacked subject-matter jurisdiction to address the claims for breach of contract and intentional interference with a contract, as well as any claim for outrage arising out of Preston's disenrollment. The record reveals that Calvary Christian disenrolled Preston due to his parents' failure to comply with the Matthew 18 Principles, principles that were expressly adopted by Calvary Christian in its handbook as the approved procedure for handling conflict. In fact, the Huffstuttlers signed a student/family intent form, which stated in relevant part:

> The signing of this document represents a visible and willful bond between the Huffstuttler family and Calvary Christian School.
>
> Before entering a student in any aspect of the school's program, which includes any day care through twelfth grade, several basic aspects relative to the philosophy and intent of the school must be agreed upon by the enrolling family and the school body.
>
> By signing this document the family understands that:
>
> . . . .
>
> 2) The integration of Christian world views and application of biblical principals [sic] is required in every course and activity of the school program.
>
> . . . .
>
> Furthermore, the family agrees:

---

[6] The Huffstuttlers claim that the school has no constitutional protection because it is not affiliated with a church or other religious organization. However, an unaffiliated parochial school is similar to a congregational or self-governing church. Here, Calvary Christian operates on Biblical principles and is self-governing and thus answers to no other religious organization. While the Supreme Court has yet to address the issue in the context of self-governing religious institutions, such as parochial schools, we conclude that such institutions are entitled to the same constitutional protection afforded to hierarchical religious institutions. *Guinn v. Church of Christ of Collinsville, supra.* The circuit court erred in holding otherwise.

1) To respect the statement of faith of Calvary Christian School.

2) To verbally and authoritatively support the individual teachers, their classroom rules . . . .

3) To carefully determine to use the Matthew 18 principle of reconciling differences by first conferring with the most immediate staff member related to the incident in question, and then only pursuing the proper, progressive chain of authority when matters are not acceptably resolved.

During the dispute between the Huffstuttlers and Calvary Christian, the Huffstuttlers recommitted to adhering to the school's policies and procedures by signing a new agreement, which stated in part, "The family agrees to support the policies, procedures, staff, and administration of [Calvary Christian]. We will not make any negative comments that could possibly destroy the ministry and unity of [Calvary Christian]." The disenrollment letter, sent to the Huffstuttlers seven days later, specifically stated:

As you know, we met with you recently for a conference due to concerns the school had about comments made, and it was discussed with you the conditions under which Preston would be allowed to continue as a student of Calvary Christian School without interruption. At that time, each of you signed an agreement to support the policies, procedures, staff, and administration of the school. A copy is attached to this letter although you should be aware of its contents.

Since then, the school has learned that you violated the terms of this agreement. Additionally, the school has a philosophy, based on Biblical principles, to cooperate with the home in the education of the child. The comments and actions of the last several days indicate that the school cannot fulfill this philosophy in the case of Preston. The school is also concerned that comments that have been made may be defamatory. After careful review of all the circumstances involved, the school board has determined that the school is no longer in a position where it can continue the enrollment of Preston.

A review of this information reveals that the school disenrolled Preston because his parents failed to comply with school policies, which are rooted in Matthew 18 principles. Any analyses of whether the school breached or interfered with its agreement with the Huffstuttlers would require us to determine whether the Huffstuttlers did,

or did not, comply with Matthew 18. Likewise, the outrage claim arising out of Preston's disenrollment would require a similar determination. In contrast, the Huffstuttlers' other claims survive because, even if the school had not disenrolled Preston, he could have filed a lawsuit against the school, alleging the tort of defamation and the tort of outrage based on allegations of surveillance at the school. Thus, we hold that the claims for breach of contract and intentional interference with a contract, as well as the claim for outrage arising out of Preston's disenrollment, are outside the purview of the circuit court's subject-matter jurisdiction.

Appellants next contend that the circuit court erred in denying their directed-verdict motion on the remaining outrage claim arising out of the surveillance allegations. We agree. A motion for directed verdict is a challenge to the sufficiency of the evidence. In addressing the sufficiency issue, we first view the evidence in the light most favorable to the party against whom the verdict is sought and give that evidence the highest probative value, taking into account all reasonable inferences that can be derived from it. *Conagra, Inc. v. Strother*, 340 Ark. 672, 13 S.W.3d 150 (2000). A motion for a directed verdict should be granted only when the evidence viewed is so insubstantial as to require the jury's verdict for the party to be set aside. *Id*. A motion for a directed verdict should be denied when there is a conflict in the evidence or when the evidence is such that fair-minded people might reach different conclusions. *Id*. Under those circumstances a jury question is presented and a directed verdict is inappropriate. *Id*. It is not this court's province to try issues of fact; we simply examine the record to determine if there is substantial evidence to support the jury verdict. *Id*. Substantial evidence is defined as evidence of sufficient force and character to compel a conclusion one way or another with reasonable certainty; it must force the mind to pass beyond suspicion or conjecture. *Id*.

To establish a claim for outrage, a plaintiff must demonstrate the following elements: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community;" (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Crockett v. Essex*, 341 Ark. 558, 19 S.W.3d 585 (2000)(citing *Angle v. Alex-*

*ander,* 328 Ark. 714, 945 S.W.2d 933 (1997)). The type of conduct that meets the standard for outrage must be determined on a case-by-case basis. *Id.* This court gives a narrow view to the tort of outrage, and requires clear-cut proof to establish the elements in outrage cases. *Id.* Merely describing the conduct as outrageous does not make it so. *Id.* Clear-cut proof, however, does not mean proof greater than a preponderance of the evidence. *Id.* We have taken a strict approach in determining the validity of outrage claims, and recognized that "the tort of outrage should not and does not open the doors of the courts to every slight insult or indignity one must endure in life." *Id.*

■ Based upon the evidence presented at trial, the circuit court should have granted the motion for directed verdict on the outrage claim. In this case, the evidence supports the fact that there *was* a video camera present in Preston's classroom where he and other students occasionally changed clothes for other school events. The record, however, does not reflect any evidence that the video camera ever *recorded* any footage at the school. The essence of Preston's outrage claim is that the school *could have* used the camera to record him as he changed clothes. Yet, based upon our strict approach in claims for outrage, the mere possibility that the school *could have* taped him does not support a claim for outrage.

In cases where this court has affirmed a claim for outrage, outrageous conduct *occurred.* For instance, in *Hess v. Treece,* 286 Ark. 434, 693 S.W.2d 792 (1985), we affirmed the award of compensatory and punitive damages where the defendant, motivated by personal animosity, carried on a two-year campaign to cause plaintiff's discharge as a police officer by having plaintiff watched, and by filing false reports with plaintiff's supervisors. Likewise, in *Growth Properties I v. Cannon,* 282 Ark. 472, 669 S.W.2d 447 (1984), we affirmed compensatory and punitive damages for outrage. In that case, the cemetery owners constructed a french drain and in the process drove heavy equipment across several gravesites, which exposed the vaults of the plaintiff's deceased relatives. Upon affirming the damages, we emphasized that the construction company had alternative means to accomplish the drainage project that would not have involved the desecration of the graves. *Id.*

■ The point is that there is a fine line between intentional conduct that could have been outrageous *if it had occurred* and

conduct that is outrageous because *it did occur*. Because there was no evidence that the video camera ever recorded any activity at the school, much less that it ever recorded Preston disrobing, this case falls in line with cases where the conduct could have been outrageous if it had occurred.[7] Absent any proof of actual surveillance, the circuit court erred in failing to grant the directed-verdict motion on the outrage claim.[8] We therefore reverse the circuit court on this point.

Appellants also assert that the circuit court erred in denying their directed-verdict motion on Preston's defamation claim.[9] In order to establish his claim for defamation, Preston had to prove that (1) he sustained damages, (2) that Appellants published a false statement concerning him, (3) that the statement of the fact was defamatory, (4) that Appellants acted with knowledge that the statement was false, and (5) that the publication of the statement was a proximate cause of damages. AMI Civ. 2006, 407. In explaining a claim for defamation, we have stated that a plaintiff must establish actual damage to his reputation, but the necessary showing of harm is slight. *Ellis v. Price*, 337 Ark. 542, 990 S.W.2d 543 (1999). A plaintiff must prove that the defamatory statement(s) have been communicated to others and that the statements have

---

[7] Contrary to the dissent's suggestion that we have usurped the role of the jury, the jury's verdict in favor of Preston on his claim for outrage is not supported by evidence that compels a conclusion one way or another with reasonable certainty; that is, the verdict is based on sheer speculation and conjecture. Specifically, the verdict depends on a series of inferences drawn from the mere fact that a video camera was located in Preston's classroom: first, the camera was operable; second, that it recorded activity in the classroom; and finally, in the dissent's own words, "that Preston was filmed whilst in a state of undress." Such attenuated inferences, amounting to nothing more than speculation, do not satisfy our requirements of clear-cut proof in outrage cases. *Hess v. Treece, supra; Growth Properties I v. Cannon, supra.*

[8] We also note that there was no evidence of any criminal charges being filed as a result of the alleged surveillance at the school.

[9] Appellants also seek reversal on Dorma's defamation claim. Specifically, Dorma alleged that Ms. Hess defamed her when she called her "Satan." Moreover, Mark Main, a school coach, testified that Ms. Hess called Dorma a "devil woman." In addition, Ms. Hess herself testified that it was a possibility she referred to Dorma as "Satan" in the presence of others. At the oral argument, however, the Huffstuttlers conceded the merits of Appellants' argument for reversal based on our case law that prohibits the award of punitive damages when there is no award of compensatory damages. *Bell v. McManus*, 294 Ark. 275, 742 S.W.2d 559 (1988). The jury awarded Dorma punitive damages but failed to award her any compensatory damages.

detrimentally affected those relations. *Id.* The law does not require proof of actual out-of-pocket expenses. *Id.*

The Huffstuttlers claimed that Suzanne Hess called Preston a "liar" after he located the video camera in the classroom, and she later accused him of engaging "in vulgar and lewd behavior" by giving her the "finger" at a football game. With regard to the video camera, Ms. Hess at first denied the existence of the video surveillance system to several individuals at a parent-teacher conference. She and the other Appellants eventually re-canted and admitted that the video camera was placed in the ventilation system by one of the school's board members, M.C. "Buddy" Lewellen, Jr. With regard to the alleged "finger" inci-dent, Preston claimed that Ms. Hess defamed him when she told people that he gave her the "finger" at a football game. Specifi-cally, Ms. Hess testified that she had a photo of what she perceived to be Preston giving her the "finger." While she no longer had the photo, Ms. Hess admitted telling the school board and the other high school principal, Alan Jackson, that she had a photograph of Preston "giving her the finger" at a school function. According to Preston's mother, Mr. Jackson called her to tell her that Ms. Hess had a photo of Preston giving her the "finger." Again, no photo was ever shown to the Huffstuttlers or produced at trial. Review-ing the evidence in the light most favorable to Preston, we cannot say that the evidence is so insubstantial as to require the jury's verdict on his claim for defamation to be set aside. We affirm the circuit court's denial of the directed-verdict motion on Preston's defamation claim.

In reviewing the jury's award of compensatory damages on Preston's defamation claim, we have said, "When an award of damages is alleged on appeal to be excessive, we review the proof and all reasonable inferences most favorable to the Appellee and determine whether the verdict is so great as to shock our con-science or demonstrate passion or prejudice on the part of the jury." *Bank of Eureka Springs v. Evans,* 353 Ark. 438, 109 S.W.3d 672 (2003). "The standard of review in such a case is that appropriate for a new trial motion, i.e., whether there is substantial evidence to support the verdict." *Id.* (citing *Advocat, Inc. v. Sauer,* 353 Ark. 29, 111 S.W.3d 346 (2003)). Turning to the issue of punitive damages, when reviewing such an award, we consider the extent and enormity of the wrong, the intent of the party com-mitting the wrong, all the circumstances, and the financial and

social condition and standing of the erring party. *Ellis v. Price,* 337 Ark. 542, 990 S.W.2d 543 (1999). Punitive damages are to be a penalty for conduct that is malicious or done with the deliberate intent to injure another. *Id.*

■ Under this argument, Appellants contend that Preston's defamation claim "centers on an alleged photograph," but that "no one testified that they saw the picture and thought less of Preston as a result of it." Appellants misapprehend the scope of Preston's defamation claim. One of the bases for his defamation claim was Ms. Hess's statement to others at Calvary Christian that she had a photo of Preston engaging in vulgar and lewd behavior by giving her the "finger" at a football game. A separate basis for the claim involved statements made by Ms. Hess in which she denied the existence of a video surveillance camera after Preston reported his discovery of the video camera to school authorities. Moreover, Appellants' arguments concerning the jury's award of damages on Preston's defamation claim are merely conclusory. It is well settled that conclusory arguments, without supporting authority, will not be considered on appeal. *Fred's Inc. v. Jefferson,* 361 Ark. 258, 206 S.W.3d 238 (2005); *Kelly v. State,* 350 Ark. 238, 85 S.W.3d 893 (2002).

Affirmed in part; reversed and dismissed in part.

BROWN, J., concurring in part; dissenting in part.

GLAZE and DICKEY, JJ., dissenting.

ROBERT L. BROWN, Justice, concurring in part and dissenting in part. I agree with the majority opinion in every respect but one. I would dismiss the tort-of-outrage claim rather than address that issue.

My reasoning is based on *Drevlow v. Lutheran Church, Missouri Synod,* 991 F.2d 468 (8th Cir. 1993), which dealt with the church's suspension of a minister. In that case, the Eighth Circuit Court of Appeals said:

> The Constitution forbids secular courts from deciding whether religious doctrine or ecclesiastical law supports a particular decision made by church authorities.
>
> . . . .
>
> The First Amendment does not shield employment decisions made by religious organizations from civil court review, however, where

the employment decisions do not implicate religious beliefs, procedures, or law. *See Scharon*, 929 F.2d at 363 n. 3 (and cases cited therein).

991 F.2d at 471.

In the case before us, the decision to disenroll Preston did implicate religious beliefs and procedures, as the majority correctly holds. The Huffstuttler's claim of outrage is directly related to Preston's disenrollment. Indeed, Preston testified at length at trial that the conduct that caused him the greatest distress was Calvary Christian School's disenrollment decision, which, of course, was directly tied to religious doctrine. To hold that the First Amendment protects the disenrollment decision but then to allow a claim of outrage based on that same decision is logically inconsistent and violates the Free Exercise Clause.

For these reasons, I would dismiss the outrage claim for lack of jurisdiction.

Tom Glaze, Justice, dissenting. According to the majority, three of the Huffstuttlers' claims — breach of contract, tortious interference, and outrage relating to Preston's disenrollment — involve ecclesiastical questions that would require this court to inquire into church doctrine. Consequently, the majority finds that this court lacks jurisdiction to address these claims. I disagree with this conclusion and respectfully dissent.

The facts of this case are simple: Calvary Christian School (CCS) placed a hidden video camera in the ventilation system of a classroom that doubles as a dressing room for high school students. The Huffstuttlers became aware of the camera and, like any reasonable parents, demanded an explanation from the school. At first, CCS denied the camera's existence; then, CCS's board of directors — consisting of four members — voted to disenroll Preston Huffstuttler in retaliation for his parent's continued inquiries.

Here, CCS claims that Preston's disenrollment was based on the Huffstuttler's failure to comply with *school* policies, which according to CCS, are rooted in Matthew 18 principles. Given the factual background of this case, it is clear that CCS's argument is nothing more than a ploy to avoid liability. The majority fails to see through CCS's charade, and adopts the argument as its own. In this respect, the majority missed the fundamental difference between an ecclesiastical church and a non-profit school or institution.

The majority relies on the false assumption that CCS is an ecclesiastical institution that falls under the protection of the rule articulated in *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871). "Ecclesiastical" is defined as "[o]f or relating to the church, esp. as an institution." *Black's Law Dictionary* 551 (8th ed. 2004). Moreover, an "ecclesiastical matter" is one that "concerns church doctrine, creed, or form of worship, or the adoption and enforcement, within a religious association, of laws and regulations to govern the membership, including the power to exclude from such an association those deemed unworthy of membership." *Black's Law Dictionary* 551 (8th ed. 2004). Each case cited by the majority involves either a church or a parochial school that is run by a diocese.[1] These cases are distinguishable from the present set of facts because they are truly ecclesiastical institutions; on the contrary, CCS is not.

First, CCS is not affiliated with a religious organization. Second, according to one CCS board member, Terral Neely, the school is open to students of any denomination and there is no requirement that a student or his family be a Christian. Third, CCS does not answer to a religious hierarchy. Instead, CCS is run by a four-member school board which voted to disenroll Preston. Unfortunately for Preston and his parents, their appeal is to the school board, which has an obvious conflict of interest, as it was one of the board's members, M.C. "Buddy" Lewellen, who was the person responsible for installing the hidden camera used in the unlawful act of spying on young students while they disrobed. Overall, CCS is nothing more than a non-profit organization that must be held responsible for its actions; the majority has erred in holding otherwise.

In finding that this court lacks jurisdiction, the majority has allowed CCS and its four-member board to hide behind a religious cloak; for this reason, I dissent. I also join the dissent handed down by Justice Dickey.

---

[1] The only school-related case cited by the majority is *Gaston v. Diocese of Allentown*, 712 A.2d 757 (Pa. 1998). In *Gaston*, Joseph and Susan Gaston brought suit against a parochial school because their children were expelled after the Gastons voiced their objection to a faith based course. Ultimately, the Pennsylvania Supreme Court held that it lacked jurisdiction to hear the case because the reasons for expulsion would necessarily "involve matters of church doctrine." Unlike the case at bar, the *Gaston* case involved an ecclesiastical school that was affiliated with, and operated by, a church. Moreover, the issue raised in *Gaston* clearly involved matters of church doctrine, while the present case does not.

CORBIN and DICKEY, JJ., join in this dissent.

BETTY C. DICKEY, Justice, dissenting. I disagree with the majority's finding that CCS is entitled to a directed verdict on Preston Huffstuttler's outrage claim arising out of the allegations of clandestine surveillance at the school. The majority articulates its holding as follows:

> The record, however, does not reflect any evidence that the video ever recorded any footage at the school. The essence of Preston's outrage claim is that the school could have used the camera to video tape him as he changed clothes. Yet, based up on our strict approach in claims for outrage, the mere possibility that the school could have taped him does not support a claim for outrage.

In coming to its decision, the majority has usurped the role of the jury in direct contradiction of our standards of review. For this reason, I disagree and respectfully dissent.

It is not this court's province to try issues of fact; we simply examine the record to determine if there is substantial evidence to support the jury verdict. *City of Caddo Valley v. George,* 340 Ark. 203, 9 S.W.3d 481 (2000). It is the jury's exclusive province to weigh the evidence and draw inferences of fact not established by direct proof. *Steel Erectors, Inc. v. Lee,* 253 Ark. 151, 484 S.W.2d 874 (1972).

When reviewing the denial of a motion for directed verdict, this court reviews the evidence in the light most favorable to the party against whom the verdict is sought and gives that evidence the highest probative value, taking into account all reasonable inferences that can be derived from it. *Conagra, Inc. v. Strother,* 340 Ark. 672, 13 S.W.3d 150 (2000). Moreover, a motion for a directed verdict should be granted only when the evidence viewed is so insubstantial as to require the jury's verdict to be set aside. *Id.* Finally, a motion for a directed verdict should be denied when there is a conflict in the evidence or when the evidence is such that fair-minded people might reach different conclusions. *Id.*

With these standards in mind, it is appropriate to turn to the record to determine if there was substantial evidence to support a verdict in favor of Preston Huffstuttler on his claim for outrage stemming from the surveillance. The record indicates as follows:

- School officials placed a hidden camera in a classroom that was used as a dressing room by students.

- The hidden camera was located in a vent and designed to transmit video to a receiver, television, and VCR located in an adjoining room.

- The camera was operable while it was in the vent.

- Preston changed in the room while the camera was in the vent.

- When confronted with the discovery of the camera, school officials initially denied its existence.

- A teacher at the school denied the existence of the TV and VCR in her room, though other teachers testified that her room did contain a TV and VCR.

- After the complaints about the camera, and before any possible objective investigation, school officials removed the camera, and had access to the TV and VCR.

Although we give a narrow view to the tort of outrage, we have never held, and should not hold, that a jury cannot draw reasonable inferences from the evidence presented at trial. A review of the record indicates that there was, in fact, substantial circumstantial evidence to support a verdict in favor of Preston. *See Wal-Mart Stores, Inc. v. Dolph,* 308 Ark. 439, 825 S.W.2d 810 (1992), (holding that circumstantial evidence is sufficient to meet the substantial evidence test). By insisting on direct proof of surveillance, and ignoring the reasonable inferences that indicate surveillance, the majority also ignores the applicable standard of review in the present case.

The fact that the school placed a hidden camera in a dressing room used by children may alone give rise to an inference of wrongdoing. In *Johnson v. Allen,* 272 Ga. App. 861, 613 S.E.2d 657 (2004), a group of women filed suit against Timothy Johnson, and his employer Atlas Cold Storage, for invasion of privacy, intentional infliction of emotional distress, and fraud. The women alleged that Johnson installed video surveillance equipment in the women's restroom located at Atlas. In response, Atlas argued that the surveillance system was installed to address rumors that drugs were being sold on the premises, specifically in the women's restroom. Ultimately, the Georgia court of appeals denied Atlas's motion for summary judgment holding that — based on the evidence presented — a reasonable jury could infer that an

operable camera was concealed in the women's restroom and that the defendants knew of its existence.

Like *Johnson*, Preston has presented evidence that an operable camera was installed and that CCS knew of its existence. In addition, Preston has shown that when questioned, CCS and its employees were evasive and mendacious in their statements concerning the camera's existence. Furthermore, CCS removed the camera prior to any possible investigation as to the occurrence of actual recording. In sum, there is circumstantial evidence that could give rise to a reasonable inference that Preston was filmed whilst in a state of undress. As such, the majority was incorrect to usurp the role of the jury and decide this issue as a matter of law. For the foregoing reasons, I respectfully dissent. I also join in the dissent handed down by Justice Glaze.

GLAZE, J., joins in this dissent.