Somboun VIRAVONGA (KHAMLA), Preecha Improm,
Pan Hanshana, Terrakun Karnchanakphan, Thao Sayskoumane,
Sy Lovan, Chintana Brandes, Phra Sagob Parisanto, Sam K.
Phonekhanan, Phra Bouaphan Prathphan, Khamnang Sayakoumane
*v.* WAT BUDDHA SAMAKITHAM, Oukham K. Khattachanh,
Bounsa Sisoukrath, Bouasay Keobounhome, Sam Siripounsavath,
Oulayvanh Maymoundok

07-362                                              279 S.W.3d 44

Supreme Court of Arkansas
Opinion delivered March 6, 2008

*Warner, Smith & Harris, PLC,* by: *James M. Dunn* and *Robert A. Frazier,* for appellants.

*Pryor, Robertson, Beasley, Smith & Karber PLLC,* by: *C. Brian Meadors,* for appellees.

ROBERT L. BROWN, Justice. Appellants Somboun Viravonga and others appeal an order of the circuit court denying their motion to vacate the results of a board-of-directors election for Wat Buddha Samakitham, a Buddhist temple, and denying their motion to enjoin the newly elected board of directors from dismissing Abbot Phra Sagob Parisanto and other temple monks. We affirm the order of the circuit court.

In 1989, several members of the North West Arkansas Buddhist community came together to form Wat Buddha Samakitham, which is organized as a nonprofit corporation under Arkansas Code Annotated §§ 4-28-201–4-28-224 (Repl. 2001 and Supp. 2007). In 2005, a schism arose between two factions within the temple, with each alleging that it represented the true board of directors of the temple corporation. Appellants Somboun Viravonga and others comprised one faction. Appellees Oukham Khattachanh and others[1] comprised the other. On June 3, 2005, appellees filed suit in circuit court and alleged that Phra Sagob Parisanto, the abbot of the temple since 1992, had violated various bylaws of the temple corporation and, more specifically, had dismissed the validly elected board of directors of the nonprofit corporation and attempted to appoint a new board of directors, all in contravention of temple bylaws. The appellants, as the compet-

---

[1] When the original complaint was filed, the temple itself, Wat Buddha Samakitham, was named as the plaintiff. Nevertheless, the dispute has always been over which faction has rightful control over the temple.

ing faction, filed a cross-complaint and asserted that the abbot-appointed board of directors constituted the true board of directors and that the board of directors advanced by the appellees was self-appointed. At the heart of the initial dispute was whether the original 1989 bylaws of the temple were still in effect or whether those bylaws were effectively amended in 1992 or 1993.

Pending resolution of the matter, the circuit court appointed First National Bank of Fort Smith to take charge of the temple's bank accounts and to pay normal operating expenses. On May 8, 2006, a bench trial was held, after which the circuit court entered an order holding that the 1989 bylaws had never been validly amended and were still in effect.[2] The circuit court, however, also found that there had been no proper board-of-directors election under the 1989 bylaws and ordered that such an election take place within sixty days, at which time the temple's funds would be released to the newly elected board of directors.

The circuit court initially believed that the two factions would work together to arrange a mutually agreeable election. This proved impossible, with the parties unable to agree on either an election date or a list of approved voters.[3] On June 23, 2006, another hearing was held, at which time the circuit court placed the corporation into receivership. At that hearing, the circuit court also approved a list of eligible voters, which consisted of the appellees' list as well as names kept by the temple and furnished to the courts by the appellants. Any objections to the compiled list were to be made within fifty days. On a related point, the circuit court announced that it was interpreting the 1989 bylaws, which permit the board of directors to remove "members," to permit a duly elected board of directors to remove the abbot and monks in authority. On July 10, 2006, the court appointed a special master, Bradley D. Jesson, to conduct the election of the board of directors according to rules and regulations established by the special master.

On August 4, 2006, the appellants moved the court to reconsider its definition of an eligible voter and to allow all people who visited the temple and worshiped there to vote in the

---

[2] The issue of the invalid amendment of the 1989 bylaws has not been appealed.

[3] The temple did not keep a formal membership roster, and there were various objections to using temple mailing lists or other lists created in anticipation of litigation to determine eligibility to vote.

election. Asserting that the 1989 bylaws used a religious definition of a member of the temple (one who attended and worshiped), the appellants argued that the question of who could vote was a religious one and not a secular one, which made a court-imposed voter definition based on compiled lists inappropriate. On August 7, 2006, the appellants' motion to reconsider was denied. Appellants then proffered signed statements from over four-hundred individuals who claimed to worship at the temple but who were not included in the circuit court's list of eligible voters. On September 5, 2006, both factions agreed on a master list of eligible voters, but neither party waived its objections to the definition of an eligible voter. The court order regarding the agreed-upon voting list also provided that any person who did not appear on the master list, but claimed the right to vote, would be allowed to cast a provisional ballot in accordance with procedures established by the special master.

On September 10, 2006, the election was conducted. The appellees' slate received the majority of the master-list or approved voters. The appellants' slate received a majority of the provisional voters. However, when the approved and provisional ballots were added together, the appellees' slate received a majority of the total votes cast. The ensuing report of the special master stated that 1,150 names were on the approved list and 629 voters from that list voted. The report also stated that 736 provisional ballots were cast. A recount of the votes cast by approved voters was performed on September 11, 2006, at the request of the appellants, and the results did not change.[4]

On September 15, 2006, the circuit court entered an order confirming the election of the board of directors. Also, on September 15, 2006, the appellants moved to vacate the election results, citing various problems and irregularities. After filing a notice of appeal, the appellants requested a stay to prevent the new board of directors from removing the abbot or monks. In that request, they argued that doing so would change the denomination of the temple from Dhammayut, the affiliation of the current abbot and monks, to another form of Buddhism. On September 29, 2006, a hearing was held, following which the circuit court found

---

[4] The special master's report of votes cast is attached as an Addendum to this opinion.

that the 1989 bylaws contemplated a Buddhist temple that was open to anyone who practiced the Buddhist faith, rather than a Dhammayut temple.

On October 3, 2006, the circuit court entered an order denying the motion to stay and the motion to vacate the election results. The court said:

> The Defendant was unhappy with [the circuit court's definition of an eligible voter], and informed the Court that there were at least four hundred other people who were being disenfranchised by the Court's ruling, so the Court established a provisional vote, and said that those people could vote, and we would then count their vote and see if it made any difference in the ultimate disposition of the case.

> Ultimately, a provisional vote was taken, and it made no difference in the disposition of the case. Evidently, while the Defendant's slate of candidates did prevail better on the provisional ballots, they did not secure sufficient ballots to win any of the seven Board of Directors' positions.

> The Court thinks it would be a travesty of justice to allow this Board of Directors and/or this monk, or leadership of this church, to retain control of this temple.

## I. Secular Voting Requirements

Appellants first contend that, by creating a master list of eligible voters, the circuit court impermissibly imposed a secular definition of temple membership. The 1989 bylaws, they note, read that the bylaws were "created for all worshipped [sic] individuals who come to Wat Buddhasamakitham." Moreover, the articles of incorporation for the temple state that "[e]ach person of this Church in good and regular standing according to the By-Laws is to be an active member of this Corporation and . . . entitled to one vote in all meetings of the Church." Because of this, the appellants argue that worship at the temple, not appearance on a mailing list or any other list, is the main qualification for membership at the temple and eligibility to vote for the board.

By limiting voting to members of the households of people appearing on certain mailing lists, the appellants continue, the circuit court disenfranchised over four hundred members of the

temple. By doing so, they urge, the circuit court not only violated the Establishment Clause of the First Amendment to the United States Constitution and the corresponding provisions of the Arkansas Constitution, but also denied those members of the temple who did not appear in the voter list their right to the free exercise of religion under the same constitutional provisions. The appellants admit that these four hundred people were allowed to cast provisional ballots, but they argue that a provisional ballot was not the equivalent of a regular ballot and that the circuit court's secular definition based on lists may have suppressed voter turnout, because those who were not on the approved-voter list could not be sure that their votes would be counted.

Appellees respond that no one who met the appellants' religious definition of a member of the temple as found in the 1989 bylaws was, in fact, prevented from voting. Rather, people falling into this category were allowed to cast a provisional ballot. Even if these provisional ballots are included in the election results, they observe, the appellees' slate of candidates received the majority of votes. They contend, therefore, that any error in the circuit court's definition of a person eligible to vote was harmless.

The appellees add that it was not error for the circuit court, in the absence of a temple membership list, to compile a list of members who worshiped at the temple and who had historically been considered members of the temple. In doing so, it is argued, the court was interpreting an ambiguous phrase in the 1989 bylaws concerning membership and attempting to alleviate concerns about voter fraud.

### a. Subject-Matter Jurisdiction

The first issue that must be decided by this court is whether the circuit court had subject-matter jurisdiction to determine the issue of who could vote in the temple election. Though neither party raises the issue of subject-matter jurisdiction or asks for a dismissal of this appeal, this court has said that "subject-matter jurisdiction is an issue that can and indeed must be raised by this court sua sponte." *James v. Williams*, 372 Ark. 82, 86, 270 S.W.3d 855, 858 (2008). Because, in the present case, subject-matter jurisdiction is a question of constitutional interpretation, the standard of review for this matter is de novo. *Weiss v. McLemore*, 371 Ark. 538, 541, 268 S.W.3d 897, 899 (2007). Both the United

States Constitution[5] and the Arkansas Constitution[6] prohibit the courts from becoming involved in disputes between members of a religious organization that are "essentially religious in nature," because the resolution of such disputes "is more properly reserved to the church." *Gipson v. Brown*, 295 Ark. 371, 374, 749 S.W.2d 297, 298 (1988).

Nonetheless, "[i]t is unquestionably the duty of the courts to decide legal questions involving the ownership and control of church property." *Holiman v. Dovers*, 236 Ark. 211, 219, 366 S.W.2d 197, 204 (1963) (supplemental opinion denying rehearing). As the United States Supreme Court has noted, "[t]he State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." *Jones v. Wolf*, 443 U.S. 595, 602 (1979). Yet, even when a property dispute is involved, courts must refrain from settling the dispute "on the basis of religious doctrine and practice" and instead apply only "neutral principles of law." *Id.* at 602-03; *see also Ark. Presbytery of Cumberland Presbyterian Church v. Hudson*, 344 Ark. 332, 339, 40 S.W.3d 301, 306 (2001) (expressly adopting the United States Supreme Court's neutral-principles approach); *Gipson*, 295 Ark. at 377, 749 S.W.2d at 300 (applying the neutral-principles-of-law analysis to determine whether there was jurisdiction over an internal church dispute).

This court has found that, in certain types of disputes, a neutral-principles analysis is impossible and courts, therefore, lack

---

[5] The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend. 1.

[6] Article 2, § 24 of the Arkansas Constitution states:

All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can, of right, be compelled to attend, erect, or support any place of worship; or to maintain any ministry against his consent. No human authority can, in any case or manner whatsoever, control or interfere with the right of conscience; and no preference shall ever be given, by law, to any religious establishment, denomination or mode of worship, above any other.

Article 2, § 25 of the Arkansas Constitution states:

Religion, morality and knowledge being essential to good government, the General Assembly shall enact suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of public worship.

subject-matter jurisdiction to hear the religious dispute. For example, we have held that courts lack subject-matter jurisdiction: (1) to resolve a religious official's breach-of-contract claim, where resolution of the claim requires the court to determine whether termination of the official was proper under religious law, *El-Farra v. Sayyed*, 365 Ark. 209, 214, 226 S.W.3d 792, 795-96 (2006); (2) to determine whether a religious organization has defamed a religious leader, where determining the truth or falsity of the organization's statements requires an inquiry into religious law, *id.* at 216, 226 S.W.3d at 796-97; (3) to adjudicate claims of breach of contract, intentional interference with a contract, and outrage stemming from a student's disenrollment from a parochial school, where adjudicating the claims requires the court to determine whether the student's family abided by certain religious precepts, *Calvary Christian Sch., Inc. v. Huffstuttler*, 367 Ark. 117, 128-29, 238 S.W.3d 58, 67 (2006); (4) to adjudicate a reverend's promissory estoppel claim against a bishop based on breach of a promise to appoint the minister to a specific pastorship, where adjudication of the claim requires the court to determine whether, based on church doctrine and policy, it was reasonable for the minister to rely on the bishop's promise, *Belin v. West*, 315 Ark. 61, 67-68, 864 S.W.2d 838, 842 (1993); (5) to determine whether church elders have a duty to release certain financial information to church members, where the dispute is focused on whether church members have a "biblically based right to access the records of the church and to determine who the elders of the church will be," *Gipson*, 295 Ark. at 377, 749 S.W.2d at 300.

While "it is impermissible for the civil courts to substitute their own interpretation of the doctrine of a religious organization for the interpretation of the religious organization," *Belin*, 315 Ark. at 67, 864 S.W.2d at 841, a court may nonetheless have to examine documents of a partially religious nature, such as church constitutions, in resolving a property dispute. *Jones*, 443 U.S. at 604. For example, a court can look at "(1) the language of the deeds; (2) the terms of the local church charters; (3) the state statutes governing the holding of church property; and (4) the provisions in the constitution of the general church concerning the ownership and control of church property" in determining whether a local church or one of its governing bodies holds title to church property. *Hudson*, 344 Ark. at 338, 40 S.W.3d at 306 (citing *Jones*, 443 U.S. 595). A court may also look at the governing rules

of a church to determine whether certain members of the church are eligible to vote in a particular church election. *Rowland v. Wilkerson*, 239 Ark. 390, 392, 389 S.W.2d 627, 628 (1965).

The United States Supreme Court has acknowledged that applying the neutral-principles approach to an examination of documents relating to a religious institution is not "wholly free of difficulty." *Jones*, 443 U.S. at 604. In performing its examination, the court must be careful to scrutinize such documents in "purely secular terms," deferring to the religious institution itself for the resolution of doctrinal issues. *Id.*; *see Hudson*, 344 Ark. at 339, 40 S.W.3d at 306-07.

■ In the case before us, two factions of Wat Buddha Samakitham claimed to have rightful control over temple real property and temple funds. It is apparent to this court that in determining that an election was required under the 1989 bylaws and in supervising that election when the temple members proved incapable of conducting it on their own, the circuit court and its special master did not delve into matters that were essentially religious in nature, but rather applied neutral principles of law concerning election procedures. We hold that the circuit court and this court do not lack subject-matter jurisdiction.

### b. Merits Determination

Having decided that the circuit court properly exercised its jurisdiction over the board-of-directors election, this court turns next to the question of whether the election should be vacated because the circuit court impermissibly limited the definition of an eligible voter, which, according to the appellants, is religious in nature.[7] This court has, on many occasions, explained that an appellant must demonstrate prejudice or this court will not reverse. *See, e.g., Commercial Energy Users Group v. Ark. Pub. Serv. Com'n*, 369 Ark. 13, 20, 250 S.W.3d 225, 231 (2007). This is true "even

---

[7] We must confess to some confusion over the appellants' argument on this point. They assert that the circuit court insinuated itself into a religious and doctrinal dispute. Yet, they decline to advocate for a dismissal of this matter based on lack of subject-matter jurisdiction. Nor do the appellants assert that there should have been a dismissal for lack of subject-matter jurisdiction by the circuit court. On the contrary, the appellants have invoked the subject-matter jurisdiction of the courts to resolve this matter and yet have urged the circuit court used secular means to resolve a religious issue. In short, the appellants' argument, though they do not couch it in these terms, appears to be jurisdictional.

when the error is of constitutional proportions." *McCoy Farms, Inc. v. J & M McKee*, 263 Ark. 20, 27, 563 S.W.2d 409, 413 (1978).

In the case before us, the circuit court, through its special master, provided for provisional balloting for every person who wished to vote and who met the definition of an eligible voter advanced by the appellants. Those provisional ballots were counted, and they did not change the results of the election. To repeat, the circuit court found in its order on this point:

> [T]he court felt it would be ripe for fraud to not have some clear direction on who the membership was, so it elected to use the membership list that had been provided by both the Plaintiff and the Defendant in their previous litigation.

> The Defendant was unhappy with that, and informed the Court that there were at least four hundred other people who were being disenfranchised by the Court's ruling, so the Court established a provisional vote, and said that those people could vote, and we would then count their vote and see if it made any difference in the ultimate disposition of the case.

> Ultimately a provisional vote was taken and it made no difference in the disposition of the case.

The appellants, nonetheless, contend that the use of provisional ballots was, in itself, prejudicial, because the provisional ballots "were never meant to determine the outcome of the contest." This argument misses the mark. The prejudice that the appellants must demonstrate is that certain eligible voters, as members of the temple, were disenfranchised and that this disenfranchisement affected, or at least might have affected, the outcome of the election. Here, the provisional ballots prove otherwise.

Nor is the appellants' argument that the use of provisional ballots may have suppressed voter turnout persuasive. The election procedures, including the use of provisional ballots, were established and made public well before the election. Although only those on the approved-voter list received mailed notice of the election, the appellants had the opportunity to notify provisional voters of the election by means of the temple bulletin board, by public announcements at the temple, or by word of mouth. Thus, anyone claiming to attend and worship at the temple had the opportunity to have his or her vote recorded. Moreover, contrary

to appellants' contention, we conclude that being "relegated" to casting a provisional vote is not per se prejudicial. Those provisional votes totaling 736 in number were, in fact, counted, and the appellees' slate of board members still prevailed. Indeed, there was no proof presented that a person who appeared at the temple to vote on September 10, 2006, was turned away as ineligible to vote under the provisional procedure. Finding no prejudice to the appellants and holding that the circuit court used neutral principles in the conduct and approval of the election, we affirm the court's order.

## II. Dismissal of the Abbot and Monks

The appellants next claim that the circuit court lacked the authority to determine that the abbot and monks were "members" of the temple who could be dismissed by the board of directors. First, they maintain that the court was without authority to determine who was or was not a member of the temple. As a second matter, the appellants urge that the circuit court disregarded the overwhelming evidence that was presented that the temple was part of the Dhammayut sect of Buddhism. The members of a temple, they argue, cannot, by a majority vote, change fundamental precepts of that temple. Furthermore, they point out that the 1989 bylaws contain no specific provision allowing the board of directors to dismiss the abbot or the monks. Appellants contend that only the Sangha Council, which is the religious assembly governing the Dhammayut denomination, can remove the abbot and only the abbot can remove the monks.

The appellees counter that there was sufficient evidence — including the 1989 bylaws and the testimony of witnesses — to support the circuit court's decision that the temple was nondenominational and congregational. They note that not all of the founders of the temple were Dhammayut and emphasize that because the temple is nondenominational Buddhist, rather than Dhammayut, the board of directors did not alter the temple fundamentally or in a vital or substantial way by replacing the abbot and the monks. Rather, they argue, the new board of directors maintained the temple's long-standing tradition of being open and inclusive. The appellees conclude by asserting that Wat Buddha Samakitham adheres to a congregational form of governance, and the majority of its members can, therefore, hire and fire

religious leaders at will. In support of this argument, appellees note that the 1989 bylaws focus on group leadership and majority control.

We initially observe that a congregational church is self-governing, and church decisions are decided by a majority vote of the membership. *Holiman*, 236 Ark. at 212, 366 S.W.2d at 199. A hierarchical church, however, is subject to the power of higher ecclesiastical authority. *Id.* In the case at hand, there is no contention that the property of Wat Buddha Samakitham is subject to any hierarchical power. The appellants do, however, contend that the temple is subject to the hierarchical authority of the Dhammayut denomination on religious matters, such as dismissing the abbot.

In 1963, this court held that "[i]t is firmly settled that the controlling faction [of a religious organization] will not be permitted to divert the church property to another denomination . . . . For instance, if a majority of a Baptist Church should attempt to combine with a Methodist or Presbyterian Church . . . the majority could not take the church property with them. *Holiman*, 236 Ark. at 213, 366 S.W.2d at 200. At the same time, this court reaffirmed that "the civil courts cannot assume independent authority to arbitrate the niceties of ecclesiastical disputations." *Id.* at 214, 366 S.W.2d at 200-01.

■ The questions now before this court do not relate to fundamental change in religious doctrine but, rather, concern whether the temple affiliated itself with a particular denomination and whether that determination can be made by using neutral principles. We hold that the circuit court did not lack subject-matter jurisdiction to decide that Wat Buddha Samakitham was a nondenominational Buddhist temple. That issue of affiliation is a factual one, which can be decided by using neutral principles. In short, the affiliation of the temple can be decided from evidence gleaned from the temple's 1989 bylaws and from witnesses.

The jurisdictional question being settled, we now turn to the circuit court's factual finding that Wat Buddha Samakitham is a nondenominational Buddhist temple to determine whether clear error occurred. Ark. R. Civ. P. 52(a) (2007); *Thompson v. Bank of America*, 356 Ark. 576, 580, 157 S.W.3d 174, 176 (2004). It is well established that "[a] finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Id.*

Here, the appellants contend that the temple is of the Dhammayut denomination of the Buddhist faith and that the board of directors is without the power to install a non-Dhammayut abbot or monks. The appellants also contend that the board of directors was entirely without authority to remove the abbot or monks, because the power to remove the abbot is limited to the Sangha Supreme Council, which governs the Dhammayut order, and the power to remove the monks is limited to the abbot.

We disagree. There was conflicting testimony about whether the temple was ever affiliated with the Dhammayut denomination. Moreover, the 1989 bylaws make no mention of an intention of the temple to be Dhammayut, but they do express an intention to provide a place of worship for all Buddhists, regardless of race or national origin.[8] We cannot conclude that the circuit court's determination that the temple was not Dhammayut was clearly erroneous. Because we decide as we do, the Wat Buddha Samakitham board of directors, as the duly appointed representative of the membership, had the authority to dismiss the abbot and monks.

The appellants, finally, argue that the circuit court impermissibly intruded on a religious matter when it found that the abbot and monks were "members" subject to removal by the board of directors. Again, we disagree. The circuit court only opined that the board of directors had the authority to decide who were temple members and in no way ordered the removal of the abbot or monks or limited the board of directors in making its own determination.

Affirmed.

---

[8] The record reflects that the various Buddhists denominations are associated with different countries. For example, the Dhammayut denomination is associated with Thailand. The appellees appear to have ties to Laos.

# EXHIBIT A

BUDDHIST TEMPLE ELECTION
APPROVED VOTERS
SEPTEMBER 10, 2006
BOARD OF DIRECTORS
2-YEAR TERM

Douglas (Viengxay) Sayarath     <u>293</u>
1. "Khamla's List"

Sue (Sommay) Sullivan     <u>292</u>
2. "Khamla's List"

Bounghoh Silvay     <u>292</u>
3. "Khamla's List"

Somoboun (Khamla) Viravongsa     <u>294</u>
4. "Khamla's List"

Phan Hansana     <u>294</u>
5. "Khamla's List"

Khamnang Sayakoumane     <u>293</u>
6. "Khamla's List"

Soutchai Vongsanith     <u>295</u>
7. "Khamla's List"

Oukham Khatthachanh     <u>333</u>
8. "Oukham's List"

Bounsa Sisoukrath     <u>329</u>
9. "Oukham's List"

Sam Siriphounsavath     <u>331</u>
10. "Oukham's List"

Souvankham Phatthong     <u>333</u>
11. "Oukham's List"

Nouchanh Sorluangsana     <u>331</u>
12. "Oukham's List"

Nong Maymoundok     <u>331</u>
13. "Oukham's List"

LattanaChounelamany     <u>331</u>
14. "Oukham's List"

EXHIBIT "1"

**BUDDHIST TEMPLE ELECTION**
**APPROVED VOTERS - RECOUNT**
**SEPTEMBER 11, 2006**
**BOARD OF DIRECTORS**
**2-YEAR TERM**

Douglas (Viengxay) Sayarath      <u>293</u>
1. "Khamla's List"

Sue (Sommay) Sullivan      <u>292</u>
2. "Khamla's List"

Bounghoh Silvay      <u>292</u>
3. "Khamla's List"

Somoboun (Khamla) Viravongsa      <u>294</u>
4. "Khamla's List"

Phan Hansana      <u>293</u>
5. "Khamla's List"

Khamnang Sayakoumane      <u>293</u>
6. "Khamla's List"

Soutchai Vongsanith      <u>294</u>
7. "Khamla's List"

Oukham Khatthachanh      <u>333</u>
8. "Oukham's List"

Bounsa Sisoukrath      <u>329</u>
9. "Oukham's List"

Sam Siriphounsavath      <u>330</u>
10. "Oukham's List"

Souvankham Phatthong      <u>332</u>
11. "Oukham's List"

Nouchanh Sorluangsana      <u>329</u>
12. "Oukham's List"

Nong Maymoundok      <u>330</u>
13. "Oukham's List"

LattanaChounelamany      <u>331</u>
14. "Oukham's List"

**EXHIBIT "2"**

**BUDDHIST TEMPLE ELECTION**
**PROVISIONAL VOTERS - SEPTEMBER 10, 2006**
**BOARD OF DIRECTORS**
**2-YEAR TERM**

Douglas (Viengxay) Sayarath     <u>373</u>
1. "Khamla's List"

Sue (Sommay) Sullivan     <u>372</u>
2. "Khamla's List"

Bounghoh Silvay     <u>371</u>
3. "Khamla's List"

Somoboun (Khamla) Viravongsa     <u>375</u>
4. "Khamla's List"

Phan Hansana     <u>373</u>
5. "Khamla's List"

Khamnang Sayakoumane     <u>374</u>
6. "Khamla's List"

Soutchai Vongsanith     <u>370</u>
7. "Khamla's List"

Oukham Khatthachanh     <u>355</u>
8. "Oukham's List"

Bounsa Sisoukrath     <u>349</u>
9. "Oukham's List"

Sam Siriphounsavath     <u>349</u>
10. "Oukham's List"

Souvankham Phatthong     <u>350</u>
11. "Oukham's List"

Nouchanh Sorluangsana     <u>349</u>
12. "Oukham's List"

Nong Maymoundok     <u>349</u>
13. "Oukham's List"

LattanaChounelamany     <u>347</u>
14. "Oukham's List"

**EXHIBIT "3"**