# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1509

_____

Robert Steinbuch,

       Plaintiff - Appellant,

v.

Jessica Cutler; Hyperion Books; Disney
Publishing Worldwide; Home Box
Office; Time Warner;

       Defendants - Appellees.

Appeal from the United States
District Court for the Eastern
District of Arkansas.

_____

Submitted: January 14, 2008
Filed: March 6, 2008

_____

Before LOKEN, Chief Judge, MURPHY, Circuit Judge, and JARVEY,[1] District
Judge.

_____

MURPHY, Circuit Judge.


     Robert Steinbuch brought this action against Jessica Cutler and several
corporate entities for invasion of privacy and intentional infliction of emotional
distress arising from the publication by Hyperion Books of Cutler's sexually explicit
novel and the potential development of a future television series based on it. The

_____

[1]The Honorable John A. Jarvey, United States District Judge for the Southern
District of Iowa, sitting by designation.

district court[2] dismissed Steinbuch's action against Cutler, Hyperion Books, and Disney Publishing Worldwide for lack of personal jurisdiction and against Home Box Office and Time Warner for failure to state a claim. Steinbuch appealed, but his appeal of the dismissal of Cutler was stayed after she filed a bankruptcy petition in New York.[3] We affirm except as to Hyperion Books.

I.

Robert Steinbuch is currently a law professor at the University of Arkansas in Little Rock. Prior to assuming that position in the summer of 2005,[4] he worked in Washington, D.C. While serving as counsel to then Senator Mike DeWine on the United States Senate Judiciary Committee, Steinbuch engaged in a sexual relationship with fellow staff member Jessica Cutler. Unbeknownst to him, Cutler was chronicling physical encounters with him and five other men in her internet weblog entitled *The Washingtonienne*. The weblog, a graphic online diary which achieved particular notoriety in Washington, D.C. when posted in May 2004, describes intimate details of Cutler's relationship with Steinbuch and her other lovers. Steinbuch was not identified by name in the weblog; he was generally referred to by his initials "RS" although Cutler at least once called him "Rob." She also revealed some personal information, including his place of employment, religious affiliation, and physical

---

[2]The Honorable William R. Wilson, Jr., United States District Judge for the Eastern District of Arkansas.

[3]Steinbuch then filed a claim against Cutler in federal bankruptcy court for the Northern District of New York. His earlier action against Cutler in federal district court in Washington, D.C. has also been stayed.

[4]Steinbuch claims in his brief that he has been a resident of Arkansas since June 1, 2005 and provided an employment offer letter from the university as supporting evidence; his complaint does not allege when he moved to Arkansas. The district court found that Steinbuch had not yet become a resident by the time the novel was published in June 2005.

attributes. ("RS looks just like George Clooney when he takes off his glasses."). Steinbuch does not dispute that he had a brief liaison with Cutler but denies particular statements she made in her weblog about some of his alleged sexual preferences and practices, including spanking and use of handcuffs.

Approximately one year after her weblog posting, Cutler authored a fictionalized book based on its content. Like the weblog, her novel is entitled *The Washingtonienne* and describes a young woman's trysts with numerous men in Washington, D.C., including a Congressional committee staff lawyer. The novel concerns fictional characters and does not refer to Steinbuch by name or by his initials. It was published in June 2005 by Hyperion Books (Hyperion), an imprint of Buena Vista Books Inc. (Buena Vista), which is a wholly owned subsidiary of Disney Publishing Worldwide (Disney). The novel was distributed throughout the United States by Time Warner Book Group, Inc., now Hachette Book Group, USA. Time Warner Book Group, Inc. was a subsidiary of Time Warner.

Steinbuch filed his complaint in the federal district court for the Eastern District of Arkansas, alleging invasion of privacy and intentional infliction of emotional distress -- the tort of outrage -- for the book's graphic description of his sexual relationship with Cutler. In addition to Cutler, he sued the publisher, its parent corporation Disney, as well as Home Box Office (HBO) and its parent Time Warner. HBO has secured an option to develop a television series based on the book.

None of the defendants reside, are incorporated, or have their principal place of business in Arkansas. Cutler, Hyperion, and Disney argued in the district court that they lacked the requisite minimum contacts with Arkansas and were therefore entitled to dismissal pursuant to Fed. R. Civ. Proc. 12(b)(2). Time Warner and HBO filed a Fed. R. Civ. Proc. 12(b)(6) motion for failure to state a claim upon which relief could be granted. In response to these motions, Steinbuch petitioned the district court for a three month extension to file a reply. Defendants asked the court to stay discovery pending its ruling on their dismissal motions because they wanted to avoid potentially

broad discovery requests and the risk of waiving their jurisdictional claims before their motions were ruled on. Steinbuch filed a motion opposing a stay of discovery; the motion made no explicit request to conduct limited discovery tailored to the specific issue of personal jurisdiction. The district court allowed Steinbuch an extension of about two months to file his reply, but granted the defense motion to stay discovery until ruling on the motions.

The district court noted that all the corporate defendants sold their products or services in Arkansas and analyzed whether it could exercise personal jurisdiction over them under either specific or general personal jurisdiction. It found that *The Washingtonienne* and other books published by Hyperion were being sold in Arkansas bookstores. There was no evidence that Hyperion had mounted a large advertising campaign, and the court observed that only about fifty copies had been sold to wholesale and retail accounts in Arkansas. The district court concluded that the exercise of personal jurisdiction over Hyperion would be unwarranted because its contacts with Arkansas were too attenuated and the injury to Steinbuch did not occur as a result of its activities directed at the forum state, especially since Steinbuch had moved to Arkansas only after publication of the novel.

The action against Disney was also dismissed for lack of personal jurisdiction because it is a separate corporate entity from Hyperion and played no role in publishing the novel. Since Steinbuch had failed to rebut Disney's affidavits that it had no direct involvement in the novel's publication, the district court concluded that he had not made a prima facie case that Disney had engaged in conduct causing his injury or that it maintained the requisite contacts with Arkansas to be subject to personal jurisdiction.

In concluding that no personal jurisdiction could be exercised over defendants, the district court noted Arkansas' relatively small interest in the dispute since the claims did not arise in the state and the alleged injuries occurred prior to Steinbuch's move to Arkansas. The court also suggested that the District of Columbia, where the

-4-

novel's events took place and where potential witnesses resided, would serve as a more appropriate forum.

The district court also granted the dismissal motions of HBO and its corporate parent Time Warner for failure to state a claim for relief under Arkansas law, concluding that the complaint offered no indication that they had invaded Steinbuch's privacy, committed outrage, or had breached a duty toward him.

On appeal Steinbuch asks us to reverse the district court's dismissal of his claims against Hyperion and Disney for lack of personal jurisdiction and against HBO and Time Warner for failure to state a claim. He also appeals the district court's stay of discovery pending its ruling on the motions to dismiss.

II.

We review a dismissal for lack of personal jurisdiction de novo, and the party asserting jurisdiction bears the burden of establishing a prima facie case. Johnson v. Woodcock, 444 F.3d 953, 955 (8th Cir. 2006). To survive a motion to dismiss, the plaintiff must state sufficient facts in the complaint to support a reasonable inference that defendants may be subjected to jurisdiction in the forum state. Dever v. Hentzen Coatings, Inc., 380 F.3d 1070, 1072 (8th Cir. 2004). The Arkansas long arm statute confers jurisdiction to the fullest constitutional extent, limiting our inquiry to whether such an exercise of jurisdiction would comport with due process. Id. at 1073; see also Ark. Code Ann. § 16-4-101(B)(1999).

Due process requires "minimum contacts" between a nonresident defendant and the forum state, such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92 (1980). The minimum contact inquiry focuses on whether the defendant purposely availed itself of the privilege of conducting activities

-5-

within the forum state and thereby invoked the benefits and protections of its laws. Hanson v. Denckla, 357 U.S. 235, 253 (1958).

The Supreme Court has recognized two theories for evaluating personal jurisdiction: general and specific jurisdiction. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984). A state may exercise general jurisdiction if a defendant has carried on in the forum state a continuous and systematic, even if limited, part of its general business; in such circumstances the alleged injury need not have any connection with the forum state. Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 779 (1984). The plaintiff must make a prima facie showing, however, that the defendant's contacts were not "random," "fortuitous," or "attenuated." Id. at 774. Specific jurisdiction on the other hand is appropriate only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state, meaning that the defendant purposely directed its activities at the forum state and the claim arose out of or relates to those activities. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985).

To evaluate the sufficiency of a defendant's contacts, we consider five factors, affording the first three primary importance: 1) the nature and quality of the defendant's contacts with the forum state; 2) the quantity of such contacts; 3) the relation of the cause of action to the contacts; 4) the interests of the forum state in providing a forum for its residents; and 5) the convenience of the parties. Burlington Industries, Inc. v. Maples Industries, Inc., 97 F.3d 1100, 1102 (8th Cir. 1996). The third factor -- the relation of the cause of action to the contacts -- applies only in the specific jurisdiction context and is immaterial in a general jurisdictional inquiry. See Johnson, 444 F.3d at 956.

A.

Hyperion contends that it maintained no contacts with Arkansas which would justify the exercise of either theory of personal jurisdiction and asserts that no specific

jurisdiction is warranted because this litigation did not result from injuries arising out of or relating to Hyperion's activities in Arkansas. See Burlington Industries, Inc., 97 F.3d at 1103. Steinbuch responds that specific jurisdiction exists over Hyperion, suggesting that he suffered harm due to the publisher's activities directed at Arkansas which resulted in the purchase of Cutler's novel by state residents. To sustain his argument, Steinbuch would have to show that Hyperion knew that "the brunt of the injury would be felt by [him] in the State in which [he] lives and works" and intentionally targeted the forum state. See Calder v. Jones, 465 U.S. 783, 789-90 (1984). This is an unlikely proposition, since the publication of *The Washingtonienne* occurred around the same time as Steinbuch's move to Arkansas.

While Steinbuch claims that he became an Arkansas resident just prior to the publication of the novel and produced an employment offer letter from the University of Arkansas to begin his position on June 1, 2005, he failed to assert in his first and amended complaints that he resided in Arkansas at the time and provided no affidavit to the district court declaring his date of residency in the state. Hyperion refuted Steinbuch's residency claim by pointing to his failure to allege this fact in his complaints. Steinbuch's cause of action appears to have no direct connection with the forum state or to have arisen out of or relate to Hyperion's activities in Arkansas. See Burger King Corp., 471 U.S. at 472. None of the events described in the novel took place in Arkansas, and Steinbuch has failed to show that Hyperion's contacts with Arkansas and the relationship between his cause of action and those contacts are sufficient to justify the exercise of specific jurisdiction. See Burlington Industries, Inc., 97 F.3d at 1102.

Hyperion asserts that no general jurisdiction exists because it did not conduct business in the forum state as defined by Arkansas statute in Ark. Code. Ann § 4-27-1501 (a foreign corporation may not transact business in Arkansas until it obtains a certificate of authority from the secretary of state). Hyperion also argues that it is not responsible for the distribution of its books and that it lacks formalized ties to Arkansas such as a bank account, a registered agent, a corporate office, or real estate.

See, e.g., <u>Dever</u>, 380 F.3d at 1074 (noting absence of these factors in finding a lack of general jurisdiction); <u>but see Vandelune v. 4B Elevator Components Unlimited</u>, 148 F.3d 943, 948 (8th Cir. 1998) (absence of these factors, while significant, is not determinative on question of market presence). Steinbuch counters that Hyperion purposely availed itself of the protections of the forum state laws by continuously and deliberately exploiting the Arkansas market. <u>See</u> <u>Keeton</u>, 465 U.S. at 781. In support of his argument, Steinbuch produced a list of approximately thirty different Hyperion book titles available in a particular Arkansas bookstore, affidavits by several individuals who purchased Cutler's novel in Arkansas, and an affidavit declaring that *The Washingtonienne* is available at all major bookstores in Arkansas, as well as through the state's central public library system.

In finding a lack of general jurisdiction, the district court emphasized the relatively small number of sales of *The Washingtonienne* in Arkansas and the lack of a substantial advertising campaign for the book in the state. In a general jurisdiction inquiry, however, we must look not to the sales of that particular novel but to Hyperion's general presence in Arkansas. <u>See</u> <u>id.</u> at 779-81 (nonresident magazine publisher subject to general personal jurisdiction for alleged defamation because it carried out part of its general business in the forum state and benefitted from the magazine sales there). The percentage of a company's sales in a given state is generally not relevant to the general jurisdiction analysis as the focus lies on whether the contacts are continuous and systematic. <u>See</u> <u>Lakin v. Prudential Securities, Inc.</u>, 348 F.3d 704, 709 (8th Cir. 2003). Since the affidavits by individuals who purchased *The Washingtonienne* in Arkansas imply that Hyperion has profited from the sale of its books in the state, the inquiry centers on whether the publisher's forum contacts are such that it purposely availed itself of the privilege of conducting business in the state and should therefore have reasonably anticipated being haled into court. <u>See</u> <u>Johnson</u>, 444 F.3d at 955.

While mere placement of a product into the stream of commerce, without more, is insufficient to constitute purposeful availment, <u>Dever</u>, 380 F.3d at 1075, we have

recognized a state's exercise of jurisdiction over a seller who delivered its products to a regional distributor with an expectation that the distributor would penetrate the forum state. See Vandelune, 148 F.3d at 948. Seeking to demonstrate that it exercised no influence over the distribution of its books, Hyperion disclosed to the district court its agreement with distributor Time Warner Book Group, Inc. Although the agreement granted the distributor the exclusive right and sole responsibility for distribution of the books throughout the United States and did not explicitly target specific states or regions, it did provide for written monthly sales reports to the publisher. The fact that it contracted to receive monthly sales reports, especially if these reports were to display sales on a state by state basis, would permit an inference that Hyperion had reasonable expectations and knowledge that its products were going to be offered in the Arkansas market. See Barone v. Rich Bros. Display Fireworks Co., 25 F.3d 610, 613 (8th Cir. 1994) (foreign fireworks producer's alleged lack of knowledge of distribution "defies reason and could aptly be labeled 'willful'"); but see Guiness Import Co. v. Mark VII Distributors, Inc., 153 F.3d 607, 615 (8th Cir. 1998) (foreign beer manufacturer whose title over the beer passed to importer in Jamaica and who exercised no control over selection of distributor in the United States not subject to jurisdiction in Minnesota).

There is also evidence, as a result of Hyperion's disclosure of the distribution agreement, that the publisher was actively involved in marketing plans and promotions of books placed in stores. Hyperion's distribution agreement provides that "Publisher will consult with Distributor with respect to establishing marketing plans, sales forecasting, determining appropriate print runs, and planning advertising and promotional campaigns for the Books, and Publisher will make and notify Distributor of final decisions." See Sondergard v. Miles Inc., 985 F.2d 1389, 1397 (8th Cir. 1993) (noting that cold medicine manufacturer did not limit where its products may be purchased and was therefore subject to general jurisdiction). It thus appears that Hyperion may have been involved in the promotion and marketing of its books and might have reasonably expected their distribution in Arkansas.

-9-

Although carrying less weight than the nature, quality, and quantity of Hyperion's contacts with the forum, other relevant factors are the interest of the state in protecting its residents and the need to ensure that a suit in the forum would not offend defendant's due process rights. Dever, 380 F.3d at 1074. Although Steinbuch is a relatively new resident, Arkansas has an interest in protecting his privacy rights as it is the forum where he would appear to suffer the most direct effects of Hyperion's activities. Cf. Lakin, 348 F.3d at 713 (state has significant interest in giving insolvent insurance companies a forum to litigate). The burden of litigation to a corporate publisher such as Hyperion, which is incorporated in California and derives profits from the sale of its books across the country, would not appear to be so great as to require dismissal. See Burger King Corp., 471 U.S. at 473-74 (unfairness could arise if parties which purposefully derive benefit from interstate activities were allowed to escape from consequences arising from those activities).

Steinbuch claims that by granting a stay of discovery pending its rulings on the motions to dismiss his complaint, the district court wrongly deprived him of the opportunity to support his jurisdictional argument. We employ an abuse of discretion standard in reviewing a district court's denial of discovery. Lakin, 348 F.3d at 713. On the basis of the current record which reflects that Steinbuch offered documentary evidence, and not merely speculations or conclusory allegations, about Hyperion's contacts with Arkansas, the district court should not have dismissed his action against Hyperion without permitting him to take some jurisdictional discovery to establish whether general personal jurisdiction would be justified. See Dever, 380 F.3d at 1074 n.1.

At this point, however, Steinbuch has not adduced sufficient proof for a prima facie case of general personal jurisdiction over Hyperion. He has not shown enough specifics about the quality and quantity of Hyperion's contacts with the state or the publisher's exploitation of the Arkansas market. We therefore remand Steinbuch's claim against Hyperion for an opportunity for tailored discovery to elicit whether its

contacts with Arkansas were so continuous and systematic as to warrant general personal jurisdiction over the publisher.

## B.

Appellee Disney asserts that it has no connection to Steinbuch's claim, refuting a basis for either theory of personal jurisdiction. Challenging Steinbuch's assertion that it should be responsible for his injuries inflicted by Buena Vista's Hyperion imprint, Disney argues that it did not contract with Cutler, did not publish the novel, and was not party to the distribution agreement. Affidavits by Hyperion and Disney executives stated that while Disney is Buena Vista's parent, they are distinct corporate entities with separate bank accounts and books and records and Disney does not control the day to day affairs of Buena Vista. Disney maintained no registered agent, bank accounts, telephone listings, real estate, or offices in Arkansas at the time Steinbuch filed suit. Steinbuch contends, however, that Disney engages in continuous and systematic business activity in Arkansas, pointing to its cable television programs in the state and the registered agent for process Disney installed in September 2006.

Before a party may obtain personal jurisdiction over a parent company, the plaintiff must show that the parent dominates and controls the subsidiary; mere ownership of subsidiary is insufficient to justify personal jurisdiction. Epps v. Stewart Information Services Corp., 327 F.3d 642, 648-49 (8th Cir. 2003). Whether a subsidiary is subject to personal jurisdiction in the state has no effect on the jurisdictional inquiry regarding its parent. Id. at 649 ("A corporation is not doing business in a state merely by the presence of its wholly owned subsidiary.").

Steinbuch failed to meet his burden of proving jurisdiction by providing any affidavits, testimony, or documents in response to Disney's affidavit denying control over Hyperion and challenging personal jurisdiction. See Dever, 380 F.3d at 1073. Steinbuch merely submitted various newspaper articles which referred to Hyperion/Disney as publisher of *The Washingtonienne*. The articles did not establish

that Disney controls Hyperion and therefore did nothing to refute Disney's affidavit. Steinbuch additionally pointed to the distribution agreement governing the sales and marketing of the book as a basis for personal jurisdiction, citing to it as evidence that Disney published the novel under the Hyperion imprint, since the agreement includes a footnote on the bottom of each page that reads "CFR/Disney Agreement.12.04.03(v5)." Even a cursory look at the distribution agreement, however, shows that it was entered into by the distributor Time Warner Book Group, Inc. and three publishers, not including Disney Publishing Worldwide. The plain language of the agreement excludes "books published by Publisher's parent company, The Walt Disney Company, and companies which are owned or controlled by The Walt Disney Company (other than Publisher)." The distribution agreement thus cannot serve to establish personal jurisdiction over Disney.

By not furnishing factual evidence in response to Disney's denial of continuous and systematic contacts in the state, Steinbuch fell short of establishing a prima facie case of general jurisdiction. Whether some arm of The Walt Disney Company media empire offers television programming in Arkansas does not determine the propriety of personal jurisdiction over appellee Disney Publishing Worldwide. The appointment of an agent for service of process in Arkansas occurred more than one year after the publication of *The Washingtonienne* and after Disney's motion to dismiss, and is but one factor in undertaking the minimum contacts inquiry; it is insufficient by itself to prove a prima facie case. See Pecoraro v. Sky Ranch For Boys, Inc., 340 F.3d 558, 562 (8th Cir. 2003) ("Minimum contacts must exist either at time the cause of action arose, the time the suit is filed, or within a reasonable period of time immediately prior to the filing of the lawsuit.").

In light of Steinbuch's failure to show that Disney had a connection with the dispute, we see no justification for the exercise of specific jurisdiction. See Calder, 465 U.S. at 788 (specific jurisdiction inquiry focuses on "the relationship among the defendant, the forum, and the litigation"). Since Steinbuch offered no credible evidence that Disney had any involvement in the publication or distribution of the

novel and instead made merely conclusory allegations about Disney's alleged role, the district court did not err in dismissing his claims for lack of personal jurisdiction.

Finally, the district court did not abuse its discretion by granting a stay of discovery against Disney because Steinbuch failed to rebut its affidavits denying corporate control over Hyperion and offered only speculative and conclusory assertions about Disney's contacts with the forum state. See Dever, 380 F.3d at 1074.

C.

We next address Steinbuch's allegation that he was harmed by HBO's acquisition of an option to produce a fictional television series based on *The Washingtonienne*. The district court granted the motion by HBO and Time Warner for dismissal under Fed. R. Civ. Proc. 12(b)(6) because it concluded that Steinbuch had failed properly to plead causes of action in his complaint for invasion of privacy and outrage.

Applying de novo review to the district court's ruling, we assume as true all allegations in the complaint which must contain sufficient facts, as opposed to mere conclusions, in support of the legal requirements of the claim to avoid dismissal. DuBois v. Ford Motor Credit Co., 276 F.3d 1019, 1022 (8th Cir. 2002). An invasion of privacy claim in Arkansas incorporates the theories of (1) misappropriating the plaintiff's name or likeness for the defendant's commercial benefit; (2) intrusion upon seclusion; (3) public disclosure of private facts; and (4) false light in the public eye. Milam v. Bank of Cabot, 327 Ark. 256, 937 S.W. 653, 657 (1997). To establish a claim of outrage, a plaintiff must demonstrate that (1) the defendant intended to inflict emotional distress or knew or should have known that the emotional distress would be the likely result of the conduct; (2) the conduct was extreme and outrageous beyond all possible bounds of decency and intolerable in a civilized community; (3) the actions of the defendant were the cause of plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be

expected to endure it.  Calvary Christian School, Inc. v. Huffstuttler, 367 Ark. 117, 238 S.W.3d 58, 68 (2006).

HBO concedes that it has acquired an option to develop a television series based on Cutler's novel but asserts that it has not published anything whatsoever about Steinbuch and thus has not invaded his privacy or caused outrage.  See Calvary Christian, 238 S.W.3d at 68 (dismissing claim of outrage since the conduct has not yet occurred); Restatement 2d Torts § 652A-E (invasion of privacy implies publicity of private facts of another).  Steinbuch's complaint is devoid of any factual support for his allegation that he has been injured by the yet undeveloped television series.

Steinbuch merely speculates that HBO might injure his privacy rights at some time in the future, and its parent corporation Time Warner is not even mentioned in the body of the complaint.  See Levy v. Ohl, 477 F.3d 988, 991 (8th Cir. 2007) (complaint must allege sufficient facts to avoid dismissal).  In light of the complaint's failure to allege a colorable claim against HBO and Time Warner, there would be no basis for injunctive relief against the mere possibility of a future television series based on Cutler's novel[5] or against Time Warner for its alleged role as the distributor of *The Washingtonienne,* an allegation which is nowhere to be found in the complaint. We also find no abuse of discretion in the district court's refusal to allow discovery against Time Warner and HBO because Steinbuch's complaint lacked sufficient allegations to state a claim.

---

[5]We therefore need not discuss any potential First Amendment issues in respect to an injunction pertaining to these parties. See Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976) (prior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights).

III.

Accordingly, we affirm the judgment of the district court dismissing Disney World Publishing, Time Warner, and Home Box Office. We reverse the final judgment entered in favor of Hyperion Books, and remand for further proceedings not inconsistent with this opinion and for discovery on the issue of whether general personal jurisdiction exists over Hyperion.

_____