Cite as 2019 Ark. App. 590

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV–19–115

| | |
|---|---|
| | **Opinion Delivered** December 11, 2019 |
| MARY C. PETTY FAMILY TRUST; DAVID PETTY, TRUSTEE; AND MARY C. PETTY, INDIVIDUALLY AND AS TRUSTEE<br><br>APPELLANTS | APPEAL FROM THE HOT SPRING COUNTY CIRCUIT COURT [NO. 30CV-15-194]<br><br>HONORABLE CHRIS E WILLIAMS, JUDGE |
| V. | |
| ROBERT LOUTON<br><br>APPELLEE | AFFIRMED |

## BRANDON J. HARRISON, Judge

The parties have resolved the finality issues that we raised in a prior opinion, so this appeal's merit may now be decided.

In 2017, a jury awarded Robert Louton a $25,000 judgment against David Petty, individually, and as trustee of the Mary C. Petty Family Trust. David argues here that the circuit court erred when it declined to direct a verdict in his favor and let the jury decide whether he had committed the torts of outrage and abuse of process. We affirm the $25,000 judgment—which consists of $5,000 in compensatory damages and $20,000 in punitive damages. David Petty, either individually or as a trustee, must pay Robert Louton the money because substantial evidence supports the judgment.

We now explain why substantial evidence, which is evidence of sufficient force and character to compel a conclusion one way or another with reasonable certainty, supports the jury verdict and the court's resulting judgment. *Conagra, Inc. v. Strother*, 340 Ark. 672, 13 S.W.3d 150 (2000) (standard of review).

## I. *The Outrage Claim*

David contends that Robert failed to make a prima facie case on his outrage claim; therefore, the claim should not have been given to the jury to decide. To establish outrage, a plaintiff must establish four elements: (1) the defendant intended to inflict emotional distress or should have recognized emotional distress as a likely result of his conduct; (2) the defendant's conduct was extreme, outrageous, and utterly intolerable in a civilized community; (3) the defendant's actions caused anguish or distress to the plaintiff; and (4) the emotional distress suffered was severe and of a type that no reasonable person should be expected to endure. *Calvary Christian Sch., Inc. v. Huffstuttler*, 367 Ark. 117, 238 S.W.3d 58 (2006). As with his motion for a directed verdict in the circuit court, David argues on appeal that Robert did not sufficiently prove that David's conduct was outrageous, that Robert's emotional distress was severe enough, and that the conduct complained of was the sort that a reasonable person cannot be expected to endure.

Some background is needed to better understand our summary of the trial testimony. Robert Louton is married to David Petty's sister, Deandra Petty Louton. When the trial convened the Loutons lived in a double-wide trailer home close to a road. David lived in a house perched on a hill behind the Loutons. A fence separated the two homes. David must drive past the Loutons' home to reach his place. Mark Petty, who is David and

2

Deandra's brother, also lives on the land. David, Robert, Deanna, and Mark had lived on the property for thirty years or more when the events that caused this litigation occurred. The circuit court later determined that the land on which all the family members were living at the time of trial is owned by David and Deandra's mother, Mary (a/k/a Cathy) Petty, directly or indirectly through her trust. In other words, neither David nor the Loutons owned the land. David, however, is the "acting trustee" of his mother's trust.

Regarding the trial testimony, the jury heard about several incidents between the brothers-in-law (David and Robert) that support the outrage claim. For example, David plowed the yard around the Loutons' home in such a manner that Deandra's parked vehicle could not be moved. David claimed it was for a "bigger corn patch" for his mother. Before and after photos were shown to the jury, and they reasonably support an inference that the plowing around Deandra's SUV was not for gardening. In fact, when the jury trial was held David faced a pending felony first-degree criminal-mischief charge related to that event.

David also admitted that he had placed eight surveillance cameras along the fence line and by the side of his sister and brother-in-law's home. He claimed that cows were being turned out and that the cameras were placed to monitor that concern. The jury saw photographs of the cameras placed in a direction facing Robert and Deandra's home. Deandra testified that she and Robert live in the home (which David disputed) and that David had placed eleven cameras and pointed them toward their home. Deandra, who again, is David's sister, said that she "couldn't even open my blinds because the camera is pointing right there." David sent a note to the Loutons (dated 3 March 2016) informing them that "[t]he area is video and audio surveilled and recorded."

3

According to Deandra, David also tried to install a gate near her driveway so that she would have to call either David or their mother fifteen minutes before arriving or leaving home so the gate could be unlocked and she could then enter or exit. Deandra said that David had made threatening phone calls to Robert and that he (David) "[c]ame in the house with a gun" and tried to wrestle Robert's cellular phone away from him.

When asked, "And how has the litigation and the cameras and the gate and the towing and all that, how has that affected your husband, Robert?" Deandra answered, "Stressing. He's stressed out— . . . It upset him the way they are doing this to me. And stress. He couldn't sleep. It's just all this stress." She said that Robert is scared of David and that Robert is angry and upset because of the way Deandra had been treated. Deandra said that Robert loses sleep over the worry that David might break into their house. They use a house alarm for protection when sleeping.

Robert testified that in September 2015, David told him that he was kicking him off the land, that his wife is an "idiot," and that Mark is a "moron." David put up fence posts that rendered Robert and Deandra unable to park their car next to the front porch as usual. Next, Robert described a physical altercation with David when he and Deandra tried to enter their home around 10:00 p.m. at night. David entered too, uninvited, while shoving and pushing Robert. David left after Robert pulled out a gun. At trial, David admitted that he had a criminal conviction related to this incident that he was appealing.

Robert testified about another incident when he came home from work after dark and heard ".22 rounds going off the top of the hill" where David lives. Robert told the jury that he heard the sound of bullets and did not want to get hit by one. He described

4

indentions and bullet holes in the back bedroom wall of the Loutons' house and what he thought were bullet holes above the air-conditioning unit. He showed pictures to the jury. Robert said that he was scared of David because "he carries a gun at all times. He has come after me." Robert also said that he receives calls from Deandra and has "to come home from work at 7:30 in the morning because she can't go to her vehicle because he's parked outside 20 yards from her vehicle sitting there . . . [a]nd I'm scared for her."

Robert also described a time David called his phone while he (Robert) and Deandra were eating dinner at a restaurant and said, "I've hooked to your vehicle and I'm dragging it around the yard right now." Robert told the jury that David "took [Deandra's] new Tahoe and destroyed it with a tractor." Robert also described property damage to the septic system and damaged electrical wires because of the plowing incident. And he corroborated his wife's testimony about the cameras David had placed on the property: "Every camera is pointed at every orifice of our home." A sign placed on the property where the family members lived at the time of trial stated, "warning audio and video surveillance on duty at all times."

The following colloquy occurred during the trial:

COUNSEL:   And how has all of this affected you physically?

ROBERT:    Well, I have, I have rheumatoid arthritis. And stress brings on the swelling of the joints in my fingers and hands. And I take methotrexate, Humera. I take a shot of Humera every two weeks. And have to take prednisone. Prednisone, which causes you to gain weight from—so, I mean, you just stressed out. You're, you know, it's pretty sad when you'd rather be at work and dealing with stuff than be at your home because you're scared that—you know, we've put sirens on the doors because if he kicks in the door in the middle of the night, I mean, even

5

through all this what kind of man doesn't try to protect his wife, you know, through all this?

COUNSEL: Have you lost sleep over this?

ROBERT: Yes. I mean, what, you know, they asking my wife if I've lost sleep and this. I don't tell my wife when I, you know, what's going on in my head when I get up and go to the . . . recliner in the living room and try to go back to sleep. You know, I get, you don't, I don't—you got to be the man. You can't be, you can't be, you got to try to be tough. And you got to try to be tough through it all and try to survive it.

. . . .

I have, we have grandchildren. We have three grandchildren. And the last thing you, you can't, let them out in the yard. I mean, you can't, I mean, he's recording everything that's going on. You can't put your babies in a bathtub or in a pool out in the yard to play in and him recording it. . . . I can't even let the kids play in the yard.

The recited evidence (and there is more in the voluminous record) substantially supports the jury's conclusion that David's conduct was outrageous and that the emotional distress Robert suffered is not that which a reasonable person should have to endure. The type of mental distress contemplated by this tort includes "nervous shock to emotional upset, and . . . all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, anger, embarrassment, chagrin, disappointment, worry and nausea." *M. B. M. Co., Inc. v. Counce*, 268 Ark. 269, 280, 596 S.W.2d 681, 687 (1980). Yet "the tort of outrage should not and does not open the doors of the courts to every slight insult or indignity one must endure in life." *Travelers Ins. Co. v. Smith*, 338 Ark. 81, 89, 991 S.W.2d 591, 595 (1999).

Guns. Bullet holes. Audio and video surveillance of a residence. Threats of locked gates and controlled access to a home. A less-than-cordial letter. Sophomoric name calling.

6

Threatened property damage. Actual property damage. A pending felony criminal charge. An entry into a home under circumstances that caused the homeowner to brandish a firearm and call law enforcement. The jury heard all this and more. It heard, for example, Robert and Deandra testify about the fright, anger, worry, and humiliation that Robert experienced because he and his wife were being monitored constantly. It heard about Robert's mental distress and worry and a lack of sleep because he was concerned that David would break into his house and that he may not be able to protect his wife. That Robert's severe emotional distress was accompanied or followed by a worsening medical condition like rheumatoid arthritis is evidence the jury could have credited, or not. The jury also heard testimony regarding the duration of David's behavior—several months' worth of it, apparently. The jury was tasked to determine, considering all the proof, whether Robert suffered severe emotional distress due to David's outrageous conduct. All these things strung together amply support an outrage claim if believed. The $5,000 compensatory-damages award for outrage is affirmed.

## II. *The Punitive-Damages Claim*

In addition to the outrage claim, the jury found that David committed the tort of abuse of process but awarded no damages on the claim. For this reason, David argues that the $20,000 in punitive damages that the jury awarded to Robert must be reversed. He says the punitive-damages award cannot be upheld because the jury did not award compensatory damages for Robert's abuse-of-process claim, and Robert did not prove his outrage claim.

First, Robert did sufficiently prove his outrage claim.

7

Second, the issue of punitive damages was submitted to the jury using the following interrogatory: "Do you find from a preponderance of the evidence that Robert Louton is entitled to punitive damages against David Petty, Individually and as Trustee of the Mary C. Petty Family Trust and Mary C. Petty Family Trust?" The jury foreman wrote "yes" in response. When special interrogatories concerning damages are not requested, and this court is left in the dark regarding the basis for the jury's verdict, we will neither question nor theorize about the jury's mental machinations. *Hyden v. Highcouch, Inc.*, 353 Ark. 609, 110 S.W.3d 760 (2003). The jury's decision did not identify which tort—outrage or abuse of process—warranted punitive damages. The essence of David's argument here is that "without an award of compensatory damages on some viable claim there can be no award of punitive damages." But there was sufficient evidence to support the outrage claim and the related compensatory award ($5,000). Therefore, there was support for the punitive-damages award ($20,000).

III. *Conclusion*

The $25,000 judgment against David Petty is affirmed.

Affirmed.

GRUBER, C.J., and VIRDEN, J., agree.

*Churchwell Law Office*, by: *Joseph Churchwell*, for appellants.

*Walthall Law Firm, P.A.*, by: *Cecilia Ashcraft* and *G. Christopher Walthall*, for appellee.